Justice Dirk Sandefur delivered the Opinion of the Court.
***175 ¶1 Plaintiffs James Larson, Donald Judge, Jean Price, and the Montana Democratic Party filed a complaint in the Montana First Judicial District Court, Lewis and Clark County, seeking declaratory judgment that the act of Secretary of State Corey Stapleton (Secretary) certifying the eligibility of the Montana Green Party (Green Party) to nominate candidates for election to public offices in Montana was invalid due to noncompliance with § 13-10-601(2), MCA. Plaintiffs also sought related injunctive relief enjoining the Secretary from giving any effect to the petition. Following an evidentiary hearing that took place in three installments over a two-month period, the District Court issued detailed findings of fact, conclusions of law, and judgment invalidating the Secretary's Green Party certification and enjoining him from giving any effect to the petition. The Secretary timely appealed. Upon consideration and due to the imminent approach of the 2018 general election and related preceding statutory deadlines for ***176 preparation and distribution of statewide ballots, we issued a summary decision affirming the District Court's judgment, with a formal decision to follow in the ordinary course. In follow-up to our summary decision, we find the following restated issues dispositive:
1. Whether Plaintiffs' claim challenging the legal sufficiency of the Secretary's certification of the Green Party's ballot eligibility due to noncompliance with § 13-10-601(2), MCA, failed to state a cognizable private claim for relief?
2. Whether Plaintiffs' claim challenging the legal sufficiency of the Secretary's certification of the Green Party's ballot eligibility due to noncompliance with § 13-10-601(2), MCA, involved a non-justiciable political question?
3. Whether Plaintiffs lacked standing to challenge the legal sufficiency of the Secretary's certification of the Green Party's ballot eligibility?
4. Whether the District Court erroneously invalidated 87 signatures due to noncompliance with § 13-10-601(2), MCA ?
5. Whether the District Court abused its discretion in admitting Kevin J. Hamilton to represent Plaintiffs pro hac vice?
¶2 We affirm.
BACKGROUND
¶3 To be eligible to nominate candidates for election to public offices on the ballot in Montana, political parties must qualify as specified by § 13-10-601, MCA. In the case of a political party that did not have a candidate in either of the last two general elections who received 5% or more of the total votes cast for the last-elected governor, a party may qualify to nominate candidates for public offices by timely submitting a qualified petition to the appropriate county election administrators "signed by a number of registered voters equal to 5% or more of the total votes cast" for the last-elected governor, or 5,000 registered voters, whichever is less. Section 13-10-601(2)(a)-(c), MCA. The number must include signatures of registered voters in more than one-third of Montana's legislative districts with the number for each of those districts equal to the lesser of 150 electors or at least 5% of the total votes cast in that district for the last-elected governor. Section 13-10-601(2)(b), MCA. The petition must be *248 timely submitted with accompanying petition circulation affidavits to the appropriate county election administrators no later than 92 days before the date of the primary election. Section 13-10-601(2)(c), (d), MCA ("1 week before the [85-day] deadline" for forwarding to secretary of state). Upon receipt of the required signature sheets and accompanying affidavits, local ***177 county election administrators must "verif[y]" the submitted signatures as provided by §§ 13-27-303 to -306, MCA. Section 13-10-601(2)(c), MCA. The county administrators must then timely forward the "verified petition" sheets and attached circulation affidavits to the secretary of state with certification of the number of "valid" signatures, corresponding to referenced legislative districts, included on the attached petition sheets. Sections 13-10-601(2)(d), 13-27-306, -307, MCA.[1] Upon receipt of the forwarded petition sheets, affidavits, and county certifications, the secretary of state must "consider and tabulate" the verified petition signatures and then, upon determining that the petition includes the requisite numbers of verified signatures, certify the subject political party as eligible to nominate candidates for public office on the upcoming primary election ballot. See §§ 13-10-601(2)(d), 13-27-306, -307, MCA. Based on the current number of Montana legislative districts (100), political party qualification petitions must include the requisite numbers of signatures from at least 34 districts. Section 13-10-601(2)(b), MCA. For the 2018 primary and general elections, the petition submittal deadline was March 5, 2018. See § 13-10-601(2)(c), (d), MCA.
¶4 In 2017, two Montana Green Party leaders (Danielle and Thomas Breck) began gathering signatures to qualify the Green Party for the 2018 elections. As of the March 2018 deadline, the Brecks had only gathered and submitted approximately 700 signatures, far short of the number required to qualify the Green Party to nominate candidates for election in 2018. However, to their surprise, in the final three weeks before the March 5th deadline, Advanced Micro Targeting, a Nevada political consulting firm operating through 13 paid signature gatherers, many from out of state, independently collected an additional 9,461 signatures from four counties (Cascade, Lewis and Clark, Missoula, and Yellowstone) in support of the Green Party petition.[2] The Advanced Micro Targeting signature gatherers timely submitted their signature sheets and accompanying certification ***178 affidavits to the respective county election administrators just before expiration of the deadline.
¶5 Upon examination of the 10,160 signatures submitted, local county election administrators timely certified 7,386 signatures, including signatures from 38 legislative districts, to the Secretary as verified pursuant to §§ 13-10-601(2)(c) and 13-27-303 to -306, MCA. On March 12, 2018, based on 7,386 signatures certified from 38 legislative districts, the Secretary certified the Green Party as qualified to nominate candidates for public office pursuant to § 13-10-601(2), MCA. As certified by the Secretary, the Green Party qualified by a narrow four-district margin with eight districts meeting the minimum threshold by 11 signatures or less.
¶6 On April 2, 2018, Plaintiffs filed a district court complaint against the Secretary and the Green Party[3] seeking declaratory judgment that the Secretary's Green Party certification was invalid due to the lack of a sufficient number of valid signatures in at least 34 legislative districts as required by § 13-10-601(2), MCA. Plaintiffs' first amended complaint alleged that 210 signatures from nine districts were invalid based on various alleged defects including signatures: (1) submitted under a signature gatherer affidavit falsely attesting to personal collection; (2) not signed in substantially the same manner as the corresponding voter registration form signatures; (3) with incorrect or improperly altered signature dates; (4) not accompanied *249 by a printed name; and (5) not matched to a registered voter in the corresponding county. With the statewide ballot printing deadline and primary election fast approaching, the District Court set an expedited evidentiary hearing (show cause hearing) for April 24, 2018.
¶7 Prior to the hearing, Plaintiffs petitioned the District Court pursuant to Rule VI(C) of the Rules for Admission to the Bar of Montana, for admission of Kevin J. Hamilton of Perkins Coie LLP in Seattle, Washington, to assist in their representation pro hac vice . Plaintiffs asserted that he had specialized experience in ballot qualification and election law compliance litigation not commonly available in Montana. The Secretary objected, contrarily asserting that Plaintiffs already had highly competent and experienced Montana counsel and that out-of-state counsel was unnecessary because this litigation merely involved relatively non-complex issues of Montana election law. Summarily finding "good cause" shown, the District Court granted Plaintiffs' motion without elaboration.
***179 ¶8 Prior to the scheduled evidentiary hearing, the Secretary filed a brief in opposition to Plaintiffs' claim. In substance, the brief was essentially a motion to dismiss pursuant to M. R. Civ. P. 12(b) on the asserted grounds that Plaintiffs' complaint failed to state a cognizable private claim for relief and that the claim was non-justiciable in any event due to Plaintiffs' lack of legal standing and because it involved a political question.
¶9 On April 23, 2018, the Green Party first appeared in the litigation by notice of appearance filed the day before the scheduled evidentiary hearing. When the hearing convened the next day, the District Court denied the Green Party's motion to vacate the hearing and proceeded. Upon expiration of the allotted time, the Court set the hearing to continue on April 30th.
¶10 On April 25, 2018, the Montana Republican Legislative Campaign Committee (MRLCC) moved for leave to intervene in the case pursuant to M. R. Civ. P. 24. Identifying itself as a "duly-formed Montana political party committee dedicated to the recruitment, training, and election of Republicans to the Montana Legislature," the MRLCC asserted that it had a "direct, substantial, [and] legally protectable interest" in this matter based on the asserted fact that, if qualified for nomination, anticipated Green Party candidates in at least three Montana legislative races would likely "attract Montana voters away from [the] Democratic Party," thereby "increas[ing] the likelihood that the Republican Party candidate[s] ... will win the general election."[4] Later that day, the Green Party filed a motion to continue the scheduled April 30th hearing. The District Court summarily denied the motion. On April 27th, three days before the scheduled hearing, the Green Party filed a notice of removal in the United States District Court, thereby stripping the state court of jurisdiction pursuant to 28 U.S.C. § 1441 based on an asserted federal court action. In a further attempt to delay, the Green Party filed a state court motion on the morning of April 30th for peremptory substitution of the presiding district judge pursuant to § 3-1-804, MCA. Later that same day, the United States District Court dismissed the Green Party's federal court action on Plaintiffs' motion due to lack of federal subject matter jurisdiction.
¶11 After a new district judge assumed jurisdiction, Plaintiffs filed ***180 their own peremptory substitution motion on May 1, 2018, thereby bumping the second assigned judge off the case. The next day, the third and final assigned judge reset the evidentiary hearing to continue on May 17, 2018. When the hearing reconvened, the District Court denied MRLCC's previously filed motion to intervene and then proceeded until expiration of the allotted time. Two days before the hearing reconvened on May 24th, MRLCC moved for a stay to allow it to appeal the court's prior denial of its motion to intervene. MRLCC followed up by filing a notice of appeal that day. When the hearing reconvened on May 24th, the District Court denied MRLCC's motion for a stay, disregarded its *250 notice of appeal as procedurally premature, and then proceeded with the hearing.
¶12 Over the course of the evidentiary hearing, the District Court admitted 22 evidentiary exhibits offered by Plaintiffs. Plaintiffs also presented the testimony of two registered voters, Thai Nguyen and Dana Toole, who signed the Green Party qualification petition at the Helena Public Library on February 24, 2018. The court also heard testimony from various other witnesses presented by the parties. The Secretary offered no documentary evidence and the District Court excluded the three exhibits offered by the Green Party.[5]
¶13 On July 9, 2018, the District Court issued detailed findings of fact, conclusions of law, and declaratory judgment invalidating the Secretary's certification of the Green Party's ballot eligibility due to noncompliance with the requirements of § 13-10-601(2), MCA. The court adjudicated a total of 87 signatures from eight legislative districts invalid based on various cited legal defects. The court further enjoined the Secretary from implementing, enforcing, or otherwise giving effect to his prior Green Party certification. The court also affirmatively enjoined the Secretary to remove the Green Party from Montana's 2018 election ballot. The District Court essentially ruled that:
(1) 36 signatures from six legislative districts did not comply with §§ 13-10-601(2)(c) and 13-27-302, MCA, because the purported signature gatherer (Skye Robert Berns) submitted false affidavits attesting that he personally gathered petition signatures;
(2) an additional 31 signatures from eight legislative districts ***181 were not substantially similar to the signatures on the purported signatories' voter registration forms as required by the signature sheet form and §§ 13-10-601(2)(a), (c) and 13-27-303(1), MCA ;
(3) an additional six signatures from three legislative districts did not match the names of registered voters in those districts as required by §§ 13-10-601(2)(b), (c) and 13-27-303(1), MCA ;
(4) an additional nine signatures from four legislative districts were not associated with correct or correctly altered signing dates as required by § 13-10-601(2)(a), MCA ; and
(5) an additional five signatures from four legislative districts did not include a printed name as required by § 13-10-601(2)(a), MCA.
The signatures invalidated by the court broke down as follows:
House Berns/False Dissimilar Voter Date No Printed Invalidated District Affidavit Signature Mismatch Discrepancy Name Per-District 20 7 7 21 9 3 1 13 43 1 1 1 1 4 54 10 3 1 14 56 2 4 2 8 80 8 1 3 1 13 83 9 3 4 1 17 84 6 3 2 11 Subtotals 36 31 6 9 5 87 Invalidated Total Invalidated By District Court 87
¶14 The District Court thus found and concluded that the numbers of valid signature counts in eight legislative districts fell below the requisite number in each of those districts, to wit:
*251 House Needed Per Certified Original Invalidated Per-District District § 13-10-601 By Sec'y + Margin By Court Shortfall 20 140 145 5 7 (2) 21 135 141 6 13 (7) 43 105 107 2 4 (2) 54 130 141 11 14 (3) 56 101 103 2 8 (6) 80 132 138 6 13 (7) 83 150 161 11 17 (6) 84 150 151 1 11 (10) Total Invalidated By District Court 87
***182 The adjudicated shortfalls dropped the number of districts with the requisite number of valid signatures from the 38 qualifying districts originally certified by the Secretary to only 30, well below the 34-district minimum required by § 13-10-601(2), MCA.
¶15 The Secretary timely appealed. The Green Party did not appeal. We granted MRLCC leave to file an amicus brief in support of the Secretary's appeal.
STANDARD OF REVIEW
¶16 Whether a complaint states a cognizable claim for relief is a question of law reviewed de novo. Anderson v. ReconTrust Co., N.A. , 2017 MT 313, ¶ 7, 390 Mont. 12, 407 P.3d 692 (citing Sinclair v. BNSF Ry. Co. , 2008 MT 424, ¶ 25, 347 Mont. 395, 200 P.3d 46 ). Whether a cognizable claim is nonetheless non-justiciable as a political question or due to lack of standing are also questions of law reviewed de novo. Reichert v. State ex rel. McCulloch , 2012 MT 111, ¶ 20, 365 Mont. 92, 278 P.3d 455. We review district court findings of fact for clear error. Montanans for Justice v. State ex rel. McGrath , 2006 MT 277, ¶ 19, 334 Mont. 237, 146 P.3d 759. A finding of fact is clearly erroneous only if not supported by substantial evidence, the court misapprehended the effect of the evidence, or we are convinced upon our review of the record that the district court was mistaken. Montanans for Justice , ¶ 19 (citing Petitioners I-549 v. Missoula Irrigation Dist. , 2005 MT 100, ¶ 8, 326 Mont. 527, 111 P.3d 664 ). We review district court conclusions and applications of law de novo for correctness. Montanans for Justice , ¶ 20 (internal citation omitted). A district court abuses its discretion when it exercises its discretion based on a mistake of law, clearly erroneous finding of fact, or otherwise acts arbitrarily without employment of conscientious judgment, or in excess of the bounds of reason, resulting in substantial injustice. In re X.B. , 2018 MT 153, ¶ 19, 392 Mont. 15, 420 P.3d 538 (internal citation omitted). We review the grant or denial of injunctive relief for a "manifest abuse of discretion." Shammel v. Canyon Res. Corp. , 2003 MT 372, ¶ 12, 319 Mont. 132, 82 P.3d 912.
DISCUSSION
¶17 The Secretary's appeal raises various issues of threshold justiciability, substantive cognizability, and evidentiary sufficiency. Subject matter jurisdiction is the threshold power of a court to consider and adjudicate particular types of cases and controversies. Lorang v. Fortis Ins. Co. , 2008 MT 252, ¶ 62, 345 Mont. 12, 192 P.3d 186 ;
***183 Ballas v. Missoula City Bd. of Adjustment , 2007 MT 299, ¶ 14, 340 Mont. 56, 172 P.3d 1232 ; In re B.F. , 2004 MT 61, ¶ 18, 320 Mont. 261, 87 P.3d 427. The subject matter jurisdiction of Montana district courts derives exclusively from Article VII, Section 4, of the Montana Constitution (district court subject matter jurisdiction over "all civil matters and cases" arising at law or in equity) and conforming statutes. Harrington v. Energy W. Inc. , 2015 MT 233, ¶ 13, 380 Mont. 298, 356 P.3d 441 ; LaPlante v. Town Pump, Inc. , 2012 MT 63, ¶ 15, 364 Mont. 323, 274 P.3d 724. See *252 also §§ 3-5-301(1), -302, MCA (general statutory jurisdiction of district courts).
¶18 Justiciability is a related, multi-faceted question of whether the exercise of preexisting subject matter jurisdiction is appropriate under the circumstances in a given case based on the constitutional "case" and separation of powers provisions of Article III, Section 1, and Article VII, Section 4, of the Montana Constitution and related prudential policy limits. See Baker v. Carr , 369 U.S. 186, 217-36, 82 S.Ct. 691, 710-20, 7 L.Ed.2d 663 (1962) ; Reichert , ¶ 53 ; Heffernan v. Missoula City Council , 2011 MT 91, ¶¶ 31-34, 360 Mont. 207, 255 P.3d 80 ; Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd. , 2010 MT 26, ¶¶ 6-8, 355 Mont. 142, 226 P.3d 567 (recognizing Article VII, Section 4, of the Montana Constitution as state law counterpart to Article III, Section 2, of the United States Constitution's "case or controversy" requirement for exercise of federal jurisdiction).[6] In contrast to a "purely political, administrative, philosophical or academic" issue, an issue is justiciable if within the constitutional power of a court to decide, an issue in which the asserting party has an actual, non-theoretical interest, and an issue upon which a judgment can "effectively operate" and provide meaningful relief. See Clark v. Roosevelt Cty. , 2007 MT 44, ¶ 11, 336 Mont. 118, 154 P.3d 48 (citing Seubert v. Seubert , 2000 MT 241, ¶ 20, 301 Mont. 382, 13 P.3d 365 ). Justiciability includes distinct considerations of legal standing, ***184 mootness, ripeness, and whether a claim or issue involves a political or legal question. Reichert , ¶¶ 20, 54 ; Plan Helena , ¶ 8 ; Greater Missoula Area Fed'n of Early Childhood Educators v. Child Start, Inc. , 2009 MT 362, ¶¶ 22-23, 353 Mont. 201, 219 P.3d 881. Though not determinative of the existence or extent of a court's subject matter jurisdiction, justiciability is a mandatory prerequisite to the initial and continued exercise of that jurisdiction. See Ballas , ¶¶ 14-16 (distinguishing existence and extent of subject matter jurisdiction from justiciability as a prerequisite for exercise thereof); Clark , ¶ 11 (justiciability "is a threshold requirement" for dispute adjudication).
¶19 Apart from threshold considerations of subject matter jurisdiction and justiciability, a complaint must also state a substantively cognizable claim for relief. See M. R. Civ. P. 12(b)(6). Whether a complaint states a cognizable claim for relief is a question of substantive law on the merits rather than a threshold jurisdictional issue. Baker , 369 U.S. at 200, 82 S.Ct. at 700-01 ; Holloway v. Pagan River Dockside Seafood, Inc. , 669 F.3d 448, 452-53 (4th Cir. 2012). See also M. R. Civ. P. 12(b)(1), (6). A cognizable claim for relief generally consists of a recognized legal right or duty; infringement or breach of that right or duty; resulting injury or harm; and, upon proof of requisite facts, an available remedy at law or in equity. See Dillon v. Great N. Ry. Co. , 38 Mont. 485, 496, 100 P. 960, 963 (1909) ; 1 Am. Jur. 2d Actions § 1 ; 1A C.J.S. Actions § 64. See also Murray Cty. v. Homesales, Inc. , 330 P.3d 519, 528 (Okla. 2014) (distinguishing standing from "the issues tendered for determination"). Within this general framework, we turn to the dispositive issues presented.
¶20 1. Whether Plaintiffs' claim challenging the legal sufficiency of the Secretary's certification of the Green Party's ballot eligibility due to noncompliance with § 13-10-601(2), MCA, failed to state a cognizable private claim for relief?
¶21 The Secretary essentially asserts that Plaintiffs' complaint failed to state *253 a cognizable claim for relief because the per county voter challenge procedure and option for county administrator referral for criminal investigation are the exclusive remedies for enforcement of the requirements of § 13-10-601(2), MCA. Within constitutional limits, the Legislature has the exclusive authority to provide, define, and limit the procedures, standards, and remedies available for enforcement of compliance with Montana's election laws. See Mont. Const. arts. III, § 1, and V, § 1. The initial question is whether the Legislature has indeed limited the procedures and remedies available for enforcing compliance with § 13-10-601(2), MCA, as asserted by the Secretary. We ***185 conclude not.
¶22 A political party nomination qualification petition is valid only if it complies with the standards and processes described and incorporated into § 13-10-601(2), MCA. In general terms, a political party nomination qualification petition must: (1) be "in a form prescribed by the secretary of state"; (2) be signed by the requisite numbers of registered Montana voters on a statewide and per-district basis; and (3) include on each signature sheet only signatures personally gathered by an identified signature gatherer who must attest that he or she gathered the signatures on the dates specified on the form. See §§ 13-10-601(2)(a)-(c), 13-27-111(4), 13-27-302, MCA.[7]
¶23 Individuals seeking to qualify a political party for ballot nomination eligibility must timely submit each prescribed signature sheet form with an attached circulation affidavit executed by the person who personally gathered the included signatures to the election administrators in the county "in which the signatures were gathered." Section 13-10-601(2)(c), MCA. See also §§ 13-27-111(4), -302, MCA. In each affidavit, the affiant must attest that he or she "gathered the signatures on the [attached] petition" sheet "on the stated dates." Section 13-27-302, MCA. See also § 13-10-601(2)(c), MCA. The affiant must further attest that he or she "believe[s]" that: (1) the signatures are "genuine" and "of the persons whose names they purport to be"; (2) the signatures are those of Montana voters "registered at the address or have the telephone number" listed with each signature; and (3) "that the signers knew the contents of the petition before signing the petition." Section 13-27-302, MCA. See also § 13-10-601(2)(c), MCA.
¶24 Upon timely receipt of the petition forms and attached circulation affidavits, the county election administrators must verify that all petition signatories on each form "are registered electors of the county" by checking each printed name and address or phone number against the official registered voter list. Section 13-27-303(1), MCA. See also §§ 13-10-601(2)(c), 13-27-302, MCA (requiring signature gatherer attestation of belief that the signatures are those of Montana voters "registered at the address or [who] have the telephone number" accompanying the signature). The county administrator must then ***186 select a random subset of the confirmed voter names on each sheet and compare each associated petition signature with the signature on the current voter registration form for the listed voter name. Section 13-27-303(1), MCA. If all of the signatures in the random subset appear "genuine," then the county administrator may verify and submit the number of confirmed registered voters on that sheet to the secretary of state without similarly checking the balance of the signatures on the sheet. Sections 13-10-601(2)(c), 13-27-103, 13-27-303(1), MCA. For purposes of § 13-27-303(1), MCA, a petition sheet signature is "genuine" if it appears to be "signed in substantially the same manner as on the voter registration form" for that voter. Sections 13-27-103 and -303(1), MCA,[8] as indirectly incorporated into *254 § 13-10-601(2)(c), MCA, through express incorporation of § 13-27-303(1), MCA, to which § 13-27-103, MCA, applies. "If any of the randomly selected signatures do not appear to be genuine," the county administrator must then compare all of the remaining signatures on that sheet for substantial similarity with the signatures on the voter registration forms for the listed names. Section 13-27-303(1), MCA.[9] "At least 85 days before the date of the primary," each county election administrator must forward the "verified petition" sheets and attached affidavits to the secretary of state with a certification that, upon examination "in the manner prescribed by law," the forwarded signature sheets included the specified numbers of "valid" signatures from each legislative district referenced. Sections 13-10-601(2)(c), (d), 13-27-304, MCA.[10] ***187 ¶25 Upon receipt of the petition sheets, circulation affidavits, and certifications from the county election administrators, "the secretary of state shall consider and tabulate" the signatures certified by the county administrators. Sections 13-10-601(2)(c), (d), 13-27-307(1), MCA.[11] If upon tabulation the petition includes a sufficient number of verified signatures, both statewide and in more than a third of legislative districts, the secretary shall certify the subject political party as eligible to nominate candidates for public office on the upcoming primary election ballot. See §§ 13-10-601(2)(a), (b), 13-27-303 to -307, MCA.[12]
¶26 By express specification and incorporation by reference, § 13-10-601(2), MCA, clearly defines precise statutory processes and standards for political parties to become eligible to nominate candidates for public office. Section § 13-10-601(2), MCA, imposes specific administrative duties on county election administrators (signature verification, county tabulation, and certification) and the secretary of state (review of county certifications, statewide tabulation, and petition certification). Aside from the specified duties of the county administrators and the secretary of state, the only means of enforcement expressly provided by statute are the per-county voter challenge procedure and the option for county administrators to refer suspected "fraudulent signatures or duplicate signatures" to the county attorney for criminal investigation. The per-county voter challenge procedure merely provides a process for a registered voter in a county to compel a county administrator to verify a broader scope of petition signatures submitted in that county. Section 13-27-306, MCA. The criminal referral option merely ***188 authorizes a county administrator to request that the county attorney initiate a criminal investigation. Section 13-27-303(3), MCA. County election administrators *255 have no authority to compel a criminal investigation or prosecution. Without analysis, the Secretary asserts that the express statutory provision of these administrative processes and enforcement means manifest conclusive legislative intent to preclude a private right of action for enforcement of the requirements of § 13-10-601(2), MCA. See Dukes v. City of Missoula , 2005 MT 196, ¶ 15, 328 Mont. 155, 119 P.3d 61 (canon of expressio unius est exclusio alterius- express constitutional or statutory provision of one thing generally implies legislative intent to preclude others).
¶27 As a threshold matter, an administrative process or enforcement means is not the equivalent of a judicial remedy. See § 27-1-101, MCA (defining judicial remedies as those "administered by the courts of justice or by judicial officers empowered for the purpose by the constitution and statutes of this state"). Moreover, the Legislature's failure to expressly specify a private remedy for enforcing a statutory duty or requirement does not necessarily preclude the availability of a private remedy, even in the presence of the express provision of an agency or other government remedy. See , e.g. , Wombold v. Assocs. Fin. Servs. Co. of Mont., Inc. , 2004 MT 397, ¶¶ 33-47, 325 Mont. 290, 104 P.3d 1080 (holding that statute vesting "all powers and duties of regulation and supervision conferred by" the Montana Consumer Loan Act in Department of Administration did not preclude private enforcement of the Act), overruled in part on other grounds by Essex Ins. Co. v. Moose's Saloon, Inc. , 2007 MT 202, ¶ 17 n.3, 338 Mont. 423, 166 P.3d 451 ; Klaudt v. Flink , 202 Mont. 247, 252, 658 P.2d 1065, 1067 (1983) (recognizing implied private right of action for damages based on violations of § 33-18-201(6), MCA ), overruled in part on other grounds by Fode v. Farmers Ins. Exch. , 221 Mont. 282, 287, 719 P.2d 414, 417 (1986), superseded in part by § 33-18-242, MCA.[13] By the same ***189 token, every statutory violation or noncompliance by another does not afford a private right of action to every party adversely affected thereby. See , e.g. , Ibsen , ¶¶ 47-51 (holding that express provision of legal enforcement remedies to commissioner, preclusive language of § 33-18-242, MCA, and underlying legislative intent for agency enforcement and to limit expansion of private remedies beyond claims handling disputes manifested legislative intent to preclude private enforcement of §§ 33-18-208 and -212, MCA (barring kick-backs and excessive premiums) ); Faust v. Util. Sols., LLC , 2007 MT 326, ¶¶ 21-31, 340 Mont. 183, 173 P.3d 1183 (holding that statutory language and available legislative history providing for criminal and civil enforcement actions respectively by state prosecutors and regulatory agency manifested legislative intent to preclude private right of action for civil fines and attorney fees under Title 85 Water Use Act); Touche Ross & Co. v. Redington , 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) (considering availability of implied private remedy under federal Securities Exchange Act of 1934). Whether a private right of action exists for enforcement of compliance with a statutory duty or requirement is fundamentally a matter of legislative intent determined from applicable statutory construction principles. Faust , ¶ 24 ; Wombold , ¶ 35 ; Touche Ross , 442 U.S. at 568, 99 S.Ct. at 2485. Accord Klaudt , 202 Mont. at 250-52, 658 P.2d at 1066-67.
¶28 In construing statutes, our role "is simply to ascertain and declare what is in terms or in substance contained therein, [and] not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. When statutory language is clear and unambiguous, we must discern and effect *256 legislative intent from the plain meaning of the language used without further resort to means of statutory construction. See Mont. Vending, Inc. v. Coca-Cola Bottling Co ., 2003 MT 282, ¶ 21, 318 Mont. 1, 78 P.3d 499. If several statutory "provisions or particulars" are involved, we must, to the extent possible, construe them in harmony, giving effect to all. Section 1-2-101, MCA. Here, § 13-10-601(2), MCA, and §§ 13-27-303 through -306, MCA, neither expressly provide, nor preclude, a private enforcement remedy. Though they provide various administrative processes and enforcement means, nowhere in the comprehensive statutory scheme specified by and incorporated into § 13-10-601(2), MCA, is any express manifestation of legislative intent to limit its enforcement to those processes and means. ***190 ¶29 When a statutory scheme neither expressly provides nor precludes an asserted private right of action, the availability of an implied statutory remedy generally depends on whether: (1) the asserted private remedy is consistent with the express language of the subject statute and any encompassing statutory scheme viewed as a larger whole;[14] (2) the available legislative history manifests any legislative intent either contemplating or precluding a private enforcement remedy; (3) a statutory construction implying a proposed private remedy is reasonable and will avoid absurd results; and (4) an agency charged with the administration of a statute has previously construed it in a manner consistent or inconsistent with the asserted private remedy. Faust , ¶ 24 ; Wombold , ¶¶ 35-36 ; Klaudt , 202 Mont. at 250-52, 658 P.2d at 1066-67. Accord Ibsen , ¶¶ 47-50 (applying Klaudt / Wombold considerations).[15] Except where contrary to express statutory language, courts must liberally construe statutes enacted for remedial or "beneficent" purposes "to effect their objects and to promote justice." Wombold , ¶ 36 (quoting § 1-2-103, MCA, and State ex rel. Dreher v. Fuller , 257 Mont. 445, 448, 849 P.2d 1045, 1047 (1993) (noting beneficent purpose of Montana Subdivision and Platting Act) ). "No rule of statutory construction is more readily applied by the courts than that public statutes dealing with the welfare of the whole people are to have a liberal construction." State ex rel. Florence-Carlton Sch. Dist. No. 15-16 v. Bd. of Cty. Comm'rs of Ravalli Cty. , 180 Mont. 285, 291, 590 P.2d 602, 605 (1978) (internal citation omitted). We must liberally construe "[l]egislation enacted for the promotion of public health, safety, and general welfare" to effect its "beneficent objectives." Florence-Carlton Sch. Dist. , 180 Mont. at 291, 590 P.2d at 605 (internal citation omitted). In that regard, the Legislature is presumed as a ***191 matter of law to be "aware of the doctrine of implied statutory causes of action" when it acts. Wombold , ¶ 37 (internal citation omitted). In order to avoid a "meaningless" construction of a statute, courts must presume that the Legislature would not enact a statute protecting or benefitting "an identifiable class without enabling members of th[e] class to enforce" the rights or protections afforded by the statute. Wombold , ¶ 37.
¶30 Section § 13-10-601(2), MCA, and incorporated provisions, is a beneficent statutory scheme enacted for the manifest purpose of ensuring that previously unqualified political parties qualify for ballot access only upon the knowing request of the requisite numbers of confirmed registered voters in the requisite number of Montana counties. The Legislature clearly enacted § 13-10-601(2), MCA, to aid in the preservation of the fairness and integrity of elections in this state. Compliance with Montana's clear and unambiguous election laws is essential to the *257 fairness and integrity of our elections and the exercise of the reserved power of the people.
¶31 Though serving significant purposes, the per-county voter challenge procedure and county administrator criminal investigation referral option are inadequate or incomplete means to enforce compliance with all essential requirements of § 13-10-601(2), MCA. Neither provides a means for correcting or redressing an error by government officials in the administration of the statutory process. The per-county voter challenge procedure allows a voter registered in a county to compel a county administrator to verify a broader scope of petition signatures submitted in that county but applies only on a limited per-county basis. Section 13-27-306, MCA. Referral for criminal investigation and potential criminal prosecution presumably has an important deterrent effect but, at most, can only result in criminal sanction of individuals involved in the perpetration of "fraudulent signatures" or knowingly false circulation affidavits. Investigation and potential prosecution of signature gatherers or signatories cannot preserve the fairness and integrity of an election by preventing otherwise legally unqualified political parties from obtaining ballot access as a result of criminal conduct or other statutory noncompliance. The remedial effectiveness of the county administrator option for criminal referral is further diminished by the fact that it necessarily depends on the third-party prosecutorial discretion of the county attorney and, even then, only applies to purposeful, knowing, or negligent misconduct for which there is proof beyond a reasonable doubt. See §§ 26-1-403(2), 45-2-103(1), MCA (criminal standard of proof and requisite criminal mental states). In contrast, as manifest in this ***192 case, the remedy of declaratory judgment and derivative injunctive relief provides a complete remedy to ensure compliance with the requirements of § 13-10-601(2), MCA, prior to allowing a previously unqualified political party to place candidates for public office on the ballot. Until the Legislature may otherwise provide, a private action for declaratory judgment and associated injunctive relief is thus not only consistent with the per-county voter challenge and criminal referral option processes, but essential to meaningful enforcement of the requirements of § 13-10-601(2), MCA.
¶32 Further belying the fallacy of the Secretary's narrow construction of § 13-10-601(2), MCA, and contrarily manifesting the Legislature's contemplation of a private enforcement remedy, § 13-35-108, MCA, expressly provides that "[i]n any action brought under the election laws of this state , the appropriate district court may enjoin any person to prevent the doing of any prohibited act or to compel the performance of any act required by the election laws." (Emphasis added.) Section 13-35-108, MCA, is a broadly applicable remedy expressly provided by the Legislature for enforcement of the provisions of Title 13, MCA. Section § 13-10-601(2), MCA, including other incorporated statutory provisions, is unquestionably an "election law[ ] of this state" that imposes duties, restrictions, and requirements on petition signers, signature gatherers, and administrative officials alike.
¶33 From the time it enacted § 13-10-601, MCA, to date, the Legislature was well aware of the previously enacted Montana Uniform Declaratory Judgments Act (MUDJA). Section 27-8-101, et seq. , MCA. The MUDJA provides a legal vehicle to obtain judgments declaring relative "rights, status, and other legal relations whether or not further relief is or could be claimed." See § 27-8-201, MCA. See also § 27-8-102, MCA (stating remedial purpose of the Act "to settle and to afford relief from uncertainty and insecurity" regarding "rights, status, and other legal relations" and commanding that Act shall "be liberally construed and administered"). Any party whose rights or status "are affected by a statute ... may have determined any question of construction or validity arising under the ... statute ... and obtain a declaration of rights, status, or other legal relations thereunder." Section 27-8-202, MCA (emphasis added). The Legislature was similarly aware that injunctive relief is a supplemental remedy available to further or effect a declaratory judgment. See § 27-8-313, MCA. Independent of other cognizable statutory and common law claims for relief, declaratory judgment is available for claims substantively described by § 27-8-201, MCA, *258 and which are otherwise ***193 justiciable under § 27-8-202, MCA.[16]
¶34 Nothing in the legislative history of §§ 13-10-601(2) or 13-35-108, MCA, or the MUDJA evinces any legislative intent to except or otherwise insulate political party ballot qualification petitions-or the officials charged with administering them-from declaratory judgment actions challenging the compliance of those petitions and certifications with the requirements of § 13-10-601(2), MCA. Declaratory judgment is a predicate legal basis, inter alia , upon which a court may grant injunctive relief in accordance with applicable principles of equity. The broad language and application of § 13-35-108, MCA, and the MUDJA contrarily indicate that the Legislature indeed implicitly contemplated a private right of action for enforcing § 13-10-601(2), MCA, by declaratory judgment.
¶35 As to the third Klaudt / Wombold factor, an implied private right of action for enforcement of § 13-10-601(2), MCA, does not create potential for unreasonable or absurd results. Montana has a long history of allowing interested voters and taxpayers to assert private actions against the secretary of state and local election administrators to enforce compliance with election laws governing the nomination of political party candidates and the qualification of ballot issues. See , e.g. , State ex rel. Steen v. Murray , 144 Mont. 61, 68, 394 P.2d 761, 764-65 (1964) (original proceeding asserted by taxpayer to enjoin secretary of state from furnishing county clerks with copies of proposed ballot initiative or performing any other act in furtherance of submitting it to electors at next general election); Sawyer Stores Inc. v. Mitchell , 103 Mont. 148, 176-77, 62 P.2d 342, 355-56 (1936) (original proceeding for order enjoining secretary of state from certifying proposed ballot initiative based on noncompliance with statutory prerequisites); State ex rel. Clarke v. Moran , 24 Mont. 433, 443-46, 63 P. 390, 394-95 (1900) (original proceeding for order enjoining county clerk and recorder from printing and distributing purported Republican Party slate of candidates based on noncompliance with statutory prerequisites for party nominations); State ex rel. Russell v. Tooker , 18 Mont. 540, 541, 46 P. 530, 531 (1896) (original proceeding for order enjoining county ***194 clerk and recorder from distributing ballots including slate of purported party candidates based on noncompliance with statutory prerequisites for party nominations).[17] In Clarke , in enjoining a county election administrator from distributing ballots setting forth political party candidates not nominated in compliance with the governing statute, we rejected assertions strikingly similar to those at issue here, to wit:
The right to vote and to be a candidate for office are political rights. The duties of the [election administrator] to prepare and print the ballot have to do with these political rights, for they are the media through which the citizen may properly and safely express his will in the choice of those who shall serve the public. They are the result of the action of political power, and are themselves only other modes by which the same power is given expression. They nevertheless involve substantial *259 rights which are the subject of judicial examination, protection and enforcement, just as are all other rights which are guaranteed and protected by law.
...
The facts stated present a case affecting directly the interests of the whole people of the state . In our representative form of government the whole people are interested in having the election laws enforced, to the end that the best possible results may be obtained. Especially is this true when we are engaged in the selection of [people] to whom we at the same time entrust the power to enact laws for the state [and] to otherwise regulate public affairs.... Not only is every patriotic citizen interested in the selection of suitable candidates for members of the law-making body, but every citizen in the state has a direct personal ***195 interest in the proper conduct of the election by which a choice of candidates is made. Each county elects its own members of this body, but, in doing so, it acts on behalf of the whole people, and the state is just as vitally interested in the ultimate result as if all the legislators were chosen by the people at large.
[I]n settling such controversies, the Court ... also performs the much more important function of restraining a public [elections] officer to the bounds of duty and preserves the ballot from unlawful interference by sinister influences the object of which is to injuriously affect the result to accomplish selfish ends .
...
It is proper ... that in a case like the present, where public and private rights meet, the proceeding should be instituted upon the relation of an elector who seeks redress for himself and the great body of electors to which he belongs.... A relator is not indispensable, but it is desirable that some one should stand to answer for the propriety of the suit and be chargeable with costs if it be determined that the relief sought should be denied.
Clarke , 24 Mont. at 441-44, 63 P. at 393-94 (internal citations and punctuation omitted and emphasis added). Accord Sawyer Stores , 103 Mont. at 176-77, 62 P.2d at 355-56. Our observations in Clarke over a hundred years ago are no less applicable and cogent today. The Secretary has asserted no scenario under which an implied private right of action would or could produce an unreasonable or absurd result as a matter of law. To the contrary, except as the Legislature may otherwise hereafter provide, it would be unreasonable and absurd to narrowly construe § 13-10-601(2), MCA, as asserted by the Secretary, to deny voters and other interested parties the right to challenge the legal sufficiency of political party ballot qualification petitions under statutory requirements imposed to preserve the fundamental fairness and integrity of our elections.
¶36 As to the last Klaudt / Wombold consideration, the Secretary has made no showing that his office has ever previously administratively adopted and implemented the narrow construction of § 13-10-601(2), MCA, advanced in this case. Moreover, though agency constructions may have some persuasive value in the construction of a vague or ambiguous statute under which the Legislature has delegated an agency substantial administrative authority, an agency construction of a statute simply cannot in any event alter the express or manifestly discernable essence of a legislative enactment.
¶37 We find no indication of legislative intent, express or implied, ***196 to preclude a private right of action to enforce the requirements of § 13-10-601(2), MCA, via declaratory judgment and associated injunctive relief. An implied private right of action is consistent with the purpose and language of § 13-10-601(2), MCA. The Legislature has authority to preclude declaratory judgment as a private right of action for enforcement of compliance with § 13-10-601(2), MCA -it simply has not done so. We hold that Plaintiffs' claim for declaratory and injunctive relief challenging the legal sufficiency of the Green Party petition, and the Secretary's resulting certification thereof, stated a cognizable claim for relief.
¶38 2. Whether Plaintiffs' claim challenging the legal sufficiency of the Secretary's certification of the Green Party's ballot eligibility due to noncompliance with § 13-10-601(2), MCA, involved a non-justiciable political question?
¶39 In contrast to legal questions falling within the exclusive constitutional *260 province of the judiciary pursuant to Article III, Section 1, and Article VII, Sections 1 and 2, of the Montana Constitution, non-justiciable political questions include issues in the exclusive legal domain of the legislative branch, executive branch, or the will of the electorate at the polls. Non-justiciable political questions also include disputed issues in regard to which the exercise of judicial power would infringe upon the power of a co-equal branch of government in an area where the governing constitution either does not clearly apportion power between them or does not provide a standard for adjudication of the issue. Nixon v. United States , 506 U.S. 224, 228, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993) ; Baker , 369 U.S. at 217-37, 82 S.Ct. at 710-20 (characterizing political question inquiries as essentially matters of separation of powers and constraining constitutional limits and holding that the general constitutional guaranty of a republican form of state governments did not preclude judicial review of state voting district gerrymandering for compliance with constitutional due process and equal protection standards). Accord Columbia Falls Elem. Sch. Dist. No. 6 v. State , 2005 MT 69, ¶¶ 16-31, 326 Mont. 304, 109 P.3d 257 (holding that general legislative prerogative to determine manner and level of public school funding did not preclude judicial review of whether the Legislature complied with self-executing state constitutional duty to provide "quality" schools). "[N]ot every matter touching on politics is a political question...." Japan Whaling Ass'n v. Am. Cetacean Soc'y , 478 U.S. 221, 229, 106 S.Ct. 2860, 2865, 92 L.Ed.2d 166 (1986). The "political question doctrine [generally] excludes from judicial review [only] those controversies ... which revolve around policy choices and value determinations constitutionally committed for resolution to" ***197 other branches of government or to the people in the manner provided by law. Japan Whaling Ass'n , 478 U.S. at 230, 106 S.Ct. at 2866. In contrast, it is particularly within the province of the judiciary to construe and adjudicate provisions of constitutional, statutory, and the common law as applied to facts at issue in particular cases. Japan Whaling Ass'n , 478 U.S. at 230, 106 S.Ct. at 2866.
¶40 Montana has a compelling interest in imposing reasonable procedural requirements tailored to ensure the integrity, reliability, and fairness of its election processes, including its process for providing ballot access to political parties. See Buckley v. Am. Constitutional Law Found . Inc. , 525 U.S. 182, 191, 119 S.Ct. 636, 642, 142 L.Ed.2d 599, (1999) ; Timmons v. Twin Cities Area New Party , 520 U.S. 351, 358, 117 S.Ct. 1364, 1369, 137 L.Ed.2d 589 (1997) ; San Francisco Forty-Niners v. Nishioka , 75 Cal.App.4th 637, 89 Cal.Rptr.2d 388, 396-97 (1999). Within state and federal constitutional limits, the Legislature has the exclusive authority to enact laws to that end. Mont. Const. arts. III, § 1, and V, § 1.
¶41 The secretary of state is an executive branch officer charged by the Montana Constitution to perform duties as prescribed by the Constitution and "any other duties provided by law." Mont. Const. art. VI, §§ 1, 3 - 4. Pursuant to its constitutional authority, the Legislature has specified procedures and standards for political parties to become eligible to nominate candidates for election to public office. See § 13-10-601(2), MCA, and incorporated statutes. While the Legislature has designated the secretary of state as "the chief election officer of this state" and charged the secretary with the duty "to obtain and maintain uniformity in the application, operation, and interpretation of [its] election laws," neither the Montana Constitution, § 13-10-601(2), MCA, nor other statutory provisions incorporated therein vest the secretary of state with unilateral discretion to determine the substantive or procedural requirements for political party ballot qualification petitions. See § 13-1-201, MCA. As pertinent here, the Legislature has merely charged the secretary of state with general supervision over the administration of various Montana election laws and performing various administrative duties as specified by statute. See §§ 13-1-201 to -203, 13-10-601(2), MCA. The secretary of state has no constitutional or statutory authority, free from the constitutional power granted to the judicial branch in regard to an independently cognizable claim for relief, to declare with the force of law the meaning, effect, or compliance with the statutory processes and *261 standards for qualification of political parties to nominate candidates for public office.
¶42 Within constitutional limits, this Court and its subordinate ***198 courts have the exclusive authority and duty to adjudicate the nature, meaning, and extent of applicable constitutional, statutory, and common law and to render appropriate judgments thereon in the context of cognizable claims for relief. Mont. Const. arts. III, § 1, and VII, § 1 ; Best v. City of Billings Police Dep't of the City of Billings , 2000 MT 97, ¶ 16, 299 Mont. 247, 999 P.2d 334 ; State v. Finley , 276 Mont. 126, 135, 915 P.2d 208, 214 (1996) (quoting Marbury v. Madison , 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ), overruled in part on other grounds by State v. Gallagher , 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817. In accordance with the constitutional authority of the judiciary, the MUDJA specifically empowers district courts, on petition or complaint of "interested" persons "whose rights, status, or other legal relations are affected," to hear and render judgments declaring relative "rights, status, and other legal relations whether or not further relief is or could be claimed." Sections 27-8-201, -202, MCA.
¶43 Here, squarely within the constitutional and statutory subject matter jurisdiction of the district court, Plaintiffs stated a legally cognizable claim for relief for declaratory adjudication of the compliance of the Green Party petition within the requirements of § 13-10-601(2), MCA. The claim asserted noncompliance with well-defined statutorily prescribed processes and standards. As the executive branch officers charged with administering the statutory scheme for qualifying political parties for ballot nomination eligibility, the secretary of state and local county administrators had no discretion or authority to approve or certify the sufficiency of the Green Party qualification petition except in accordance with the statutory processes and standards specified by the Legislature. See , e.g. , § 13-27-307, MCA (secretary "may reject any petition that does not meet statutory requirements" and shall "return a[ny] rejected petition to the proper county official"), as indirectly incorporated in § 13-10-601(2)(c), MCA, by reference to §§ 13-27-303 to -306, MCA, to which § 13-27-307, MCA, applies. In the context of the cognizable legal claim asserted, adjudication of the legal sufficiency of the Green Party ballot petition in accordance with prescribed statutory processes and standards fell squarely and exclusively in the judicial power granted to this Court and its subordinate courts by Articles III, Section 1, and VII, Section 1, of the Montana Constitution. Adjudication of Plaintiffs' claim similarly did not infringe upon the reserved political power of the people. As a matter of constitutionally enacted statutory law, the people have no right to vote on candidates of political parties who have not qualified to nominate candidates for public office in the manner provided by law. See also , e.g. , ***199 Foster v. Kovich , 207 Mont. 139, 142, 673 P.2d 1239, 1242 (1983) (threshold legal sufficiency of allegations in a recall petition is a justiciable legal question rather than a political question). We hold that Plaintiffs' claim challenging the legal sufficiency of the Green Party ballot eligibility petition and the Secretary's certification thereof in compliance with § 13-10-601(2), MCA, did not involve a non-justiciable political question.
¶44 3. Whether Plaintiffs lacked standing to challenge the legal sufficiency of the Secretary's certification of the Green Party's ballot eligibility?
¶45 Standing is a threshold requirement of justiciability applicable to all claims for relief as a matter of constitutional law and related prudential policy considerations. Reichert , ¶¶ 53-55 ; Ballas , ¶¶ 14-16 ; Clark , ¶ 11 ; Stewart v. Bd. of Cty. Comm'rs of Big Horn Cty. , 175 Mont. 197, 201, 573 P.2d 184, 186 (1977) ; Flast v. Cohen , 392 U.S. 83, 95-101, 88 S.Ct. 1942, 1949-53, 20 L.Ed.2d 947 (1968).[18] Standing narrowly focuses on whether, at the time of assertion of a claim, a particular claimant is a proper party to assert the claim regardless of whether the claim is otherwise cognizable or justiciable.
*262 Heffernan , ¶ 30 ; Helena Parents Comm'n v. Lewis & Clark Cty. Comm'rs , 277 Mont. 367, 371, 922 P.2d 1140, 1142 (1996) (quoting Flast , 392 U.S. at 99-100, 88 S.Ct. at 1944 ).[19] Though substantively cognizable, a claim for declaratory judgment is nonetheless not justiciable if the plaintiff lacks personal standing to assert the claim. Glacier Cty. , ¶ 42 (citing Marbut , 231 Mont. at 135, 752 P.2d at 150 ).
¶46 A plaintiff has legal standing to assert an otherwise cognizable claim only if (1) the claim is based on an alleged wrong or illegality that has in fact caused, or is likely to cause, the plaintiff to personally suffer specific, definite, and direct harm to person, property, or exercise of right and (2) the alleged harm is of a type that available legal relief can effectively alleviate, remedy, or prevent. Schoof v. Nesbit , 2014 MT 6, ¶¶ 20-21, 373 Mont. 226, 316 P.3d 831 (clarifying the prudential requirement that an alleged injury be distinct from ***200 injury to the public in general); Reichert , ¶¶ 53-55 ; Williamson v. Mont. Pub. Serv. Comm'n , 2012 MT 32, ¶ 28, 364 Mont. 128, 272 P.3d 71 ; Heffernan , ¶¶ 30-33 ; Greater Missoula Area Fed'n , ¶¶ 22-23 ; W. Litho v. Bd. of Cty. Comm'rs of Yellowstone Cty. , 174 Mont. 245, 247, 570 P.2d 891, 892 (1977) (quoting Flast , 392 U.S. at 99, 88 S.Ct. at 1952 ); Olson v. Dep't of Revenue , 223 Mont. 464, 469, 726 P.2d 1162, 1166 (1986) (quoting Baker , 369 U.S. at 204, 82 S.Ct. at 703 ); Chovanak v. Matthews , 120 Mont. 520, 525-28, 188 P.2d 582, 584-86 (1948).[20] See also Schlesinger v. Reservists Comm. to Stop the War , 418 U.S. 208, 215-27, 94 S.Ct. 2925, 2929-35, 41 L.Ed.2d 706 (1974). Accordingly, a general or abstract interest in the constitutionality of a statute or the legality of government action is insufficient for standing absent a direct causal connection between the alleged illegality and specific and definite harm personally suffered, or likely to be personally suffered, by the plaintiff. See , e.g. , Glacier Cty. , ¶¶ 37-39 ("foreseeable" potential of government financial loss and resulting property tax increase insufficient for taxpayer standing to challenge county compliance with financial management and accountability statutes, and lack of state enforcement thereof, absent allegation of actual or likely financial loss and resulting tax increase or impairment of government function or services); Stewart , 175 Mont. at 201-03, 573 P.2d at 186-88 (alleged likelihood of economic loss or impairment of property owner redemption rights insufficient for standing in challenges of county tax deed sale procedure by delinquent property taxpayers who previously waived their pre-sale right to redeem); State ex rel. Mitchell v. First Judicial Dist. Ct. In and For Lewis and Clark County , 128 Mont. 325, 339, 275 P.2d 642, 649 (1954) (voter/taxpayer lacked standing to challenge legality of political party nomination of railroad commission candidate process, and resulting secretary of state certification, absent allegation of resulting injury to plaintiff personally); Chovanak , 120 Mont. at 525-28, 188 P.2d at 584-86 (general objection to legalized gambling insufficient for standing to challenge gambling law exception for religious, fraternal, and nonprofit organizations). Compare Raap v. Bd. of Trs., Wolf Point Sch. Dist. , 2018 MT 58, ¶ 20, 391 Mont. 12, 414 P.3d 788 (denial of teacher's right to have open school board termination hearing upon waiver of right to privacy sufficient for standing for teacher challenge ***201 of school board action at closed meeting regardless of teacher's own presence and apparent lack of any other public interest); Schoof , ¶ 21 (alleged violation of county taxpayer's right to receive public notice of county commission meeting sufficient for standing to challenge commission action at unnoticed meeting regardless of similar effect on all other taxpayers); Armstrong v. State , 1999 MT 261, ¶¶ 6-13, 296 Mont. 361, 989 P.2d 364 (interference with physician-patient relationship sufficient for standing for health care providers' challenge of constitutionality of statutory abortion *263 restrictions); Gryczan v. State , 283 Mont. 433, 440-46, 942 P.2d 112, 117-20 (1997) (risk of prosecution sufficient for standing for as-applied challenge to constitutionality of statute criminalizing same-sex sexual activity regardless of 24-year absence of state enforcement); Helena Parents Comm'n , 277 Mont. at 372-74, 922 P.2d at 1143-44 (prior financial loss, likelihood of additional loss, and likelihood of increased taxes and reduced services sufficient for standing for taxpayers'/parents' challenge of government investment practices); Lee v. State , 195 Mont. 1, 7, 635 P.2d 1282, 1285 (1981) (risk of prosecution sufficient for standing to challenge 55 mile-per-hour speed limit); W. Litho , 174 Mont. at 247-48, 570 P.2d at 892-93 (alleged economic loss to printing subcontractor/supplier of unsuccessful bidder sufficient for standing to challenge county compliance with public procurement statute). Economic harm caused by, or likely to be caused by, an alleged illegality is sufficient to establish standing to assert an otherwise cognizable claim for relief. Geil v. Missoula Irrigation Dist. , 2002 MT 269, ¶ 30, 312 Mont. 320, 59 P.3d 398 ; Missoula City-Cty. Air Pollution Control Bd. v. Bd. of Envtl. Review , 282 Mont. 255, 262, 937 P.2d 463, 468 (1997) ; Rosebud Cty. v. Mont. Dep't of Revenue , 257 Mont. 306, 309, 849 P.2d 177, 179 (1993) ; Mont. Human Rights Div. v. City of Billings , 199 Mont. 434, 443, 649 P.2d 1283, 1288 (1982).
¶47 Here, Plaintiffs presented unrebutted testimony from the Montana Democratic Party's Chief Financial Officer, Trent Bolger, that the alleged erroneous certification of the Green Party to nominate candidates for public office would, by introduction of an additional political party and candidates into the fast-approaching elections, in fact cause the Montana Democratic Party to incur otherwise unnecessary expense and burden in the form of: (1) additional campaign expenditures; (2) revision of its voter file; (3) undertaking additional fundraising efforts; (4) procuring and deploying additional staff, volunteers, and literature; and (5) conducting more expensive and complicated political polling. Unrebutted, this showing evinces a direct ***202 causal connection in fact between the alleged illegality and definite, specific, and substantial resulting harm to the Democratic Party itself. The alleged harm was clearly of a type effectively diminished, curable, or preventable by the available and requested declaratory and injunctive relief. On the record in this case, we hold that the Montana Democratic Party had legal standing to challenge the validity of the Green Party ballot eligibility petition and the Secretary's resulting certification thereof.[21]
¶48 4. Whether the District Court erroneously invalidated 87 signatures due to noncompliance with § 13-10-601(2), MCA ?
¶49 The essential purpose of § 13-10-601(2), MCA, is to ensure that previously unqualified political parties qualify for ballot access only upon the knowing request of the requisite numbers of confirmed registered voters in the requisite number of Montana counties. To that end, § 13-10-601(2), MCA, expressly and by direct and indirect incorporation, specifies precise procedures and standards for compliance by signature gatherers and the citizen petitioners (i.e., petition signatories). Section § 13-10-601(2), MCA, similarly imposes precise procedures and standards for administration of the overall process by local county administrators and the secretary of state.
¶50 Contrary to the Secretary's assertion that the District Court arbitrarily applied standards having no basis in law, the court merely and quite simply applied the precise legal standards prescribed by the Legislature and, in turn, by the secretary of state's conforming petition form pursuant to the Legislature's command. Section 13-10-601(2)(a), MCA, clearly and unequivocally provides that political parties may qualify for ballot eligibility by "presenting a petition, in *264 a form prescribed by the secretary of state ...." (Emphasis added.) Here, the Secretary's prescribed petition form clearly and unequivocally requires each signatory to provide four basic items of simple information-a printed last name (with first and middle initials), a personal signature, the signature date, and either a telephone number or a residential or post office address. The form expressly directed and warned that signatories must "sign the person's name and list the person's address ***203 or telephone number in substantially the same manner as on the person's voter registration card or the signature will not be counted ." (Emphasis added.)
¶51 The Legislature did not charge the secretary of state to prescribe an appropriate petition form in a vacuum. By manifest implication, the Legislature intended that the prescribed form correspond to the statutory qualifications specified and incorporated by reference in § 13-10-601(2), MCA. Not surprisingly, the information requested by the secretary-prescribed form at issue directly corresponds with the statutory standards and requirements referenced in §§ 13-10-601(2) and 13-27-302 to -306, MCA. The signature field on the form corresponds with the signature requirement of § 13-10-601(2)(b), MCA. The form requirement and warning that signatories must sign in substantially the same manner as on the signer's voter registration form corresponds with the genuineness standard specified by §§ 13-27-303(1) and 13-27-103, MCA, as respectively expressly and indirectly incorporated by reference in § 13-10-601(2)(c), MCA. The form requirement for a printed name and address or phone number corresponds with and crucially aids in the county voter list verification required by §§ 13-10-601(2)(c) and 13-27-303(1), MCA. The petition form signature date requirement corresponds with the affidavit requirement of §§ 13-10-601(2)(c) and 13-27-302, MCA. To the extent conforming to §§ 13-10-601(2), 13-27-302 to -306, and -103, MCA, the prescribed petition form has the effect of law. See §§ 13-10-601(2)(a), 13-1-201, 13-1-202(1)(a), (2), (3), MCA (requiring compliance with prescribed petition form, delegation of form prescription authority to secretary of state, and binding effect of secretary directives and forms on county election administrators). The Secretary does not challenge on appeal the conformance of his prescribed petition form to corresponding statutory requirements.
¶52 As an added safeguard to the integrity of the process, §§ 13-10-601(2)(c) and 13-27-302, MCA, require each signature gatherer to attest that he or she personally "gathered the signatures" on the attached petition sheet "on the stated dates." Section 13-27-302, MCA further requires each signature gatherer to also attest that he or she believes in good faith that: (1) the gathered signatures "are genuine"; (2) the signatures are the "signatures of the persons whose names they purport to be"; (3) the signatures "are the signatures of Montana electors who are registered at the address or have the telephone number following the person's signature"; and (4) "that the signers knew the contents of the petition before signing the petition." The required circulation affidavits aid in assuring signature authenticity, ***204 protecting against fraudulent or duplicate signatures, and protecting against fraudulent signature gathering practices. See §§ 13-10-601(2)(c), 13-27-302, 13-27-303(1), 13-27-303(3), MCA. These statutory requirements are far more than mere technicalities or formalities-they are simple, narrowly-tailored requirements manifestly deemed by the Legislature to be essential to the integrity of the political party ballot eligibility process and, by extension, to the integrity of elections in Montana.
¶53 Here, the District Court invalidated 36 signatures from six legislative districts due to noncompliance with §§ 13-10-601(2)(c) and 13-27-302, MCA, based on the adjudicated fact that the purported signature gatherer (Skye Robert Berns) submitted circulation affidavits falsely attesting that he personally gathered those signatures. The supporting evidence included 15 petition signature sheets submitted under circulation affidavits executed by Berns.[22] In pertinent part, the Berns signature sheets *265 included the subject 36 signatures from six Montana legislative districts-District 43 (one signature), District 54 (ten signatures), District 56 (two signatures), District 80 (eight signatures), District 83 (nine signatures), and District 84 (six signatures). In the attached circulation affidavits, Berns attested that he personally gathered the signatures submitted on those sheets. One of the Berns signature sheets included the separate signatures of Thai Nguyen and Dana Toole. Nguyen and Toole separately testified that they each signed the petition at the Helena Public Library on February 24, 2018, upon the request of a female signature gatherer. Nguyen testified that the female signature gatherer identified herself as Hannah Rose Kuntz. Nguyen and Toole testified further that Kuntz was the only person collecting signatures at that location at the time and that she was unaccompanied. Nguyen further testified that he observed Kuntz in possession of multiple petition signature sheets bearing signatures.
¶54 Hannah Rose Kuntz was not an affiant, or otherwise referenced, on any circulation affidavit submitted in support of the Green Party petition. Neither Berns nor Kuntz testified before the District Court. Neither the Secretary nor the Green Party presented any evidence rebutting the testimony of Nguyen or Toole. Nor did either of them present any other evidence corroborating Berns's affidavit assertions ***205 that he personally gathered the subject signatures as attested.[23] Substantial record evidence thus supports the District Court's finding that Berns falsely attested that he gathered the signatures included on the signature sheet signed by Nguyen and Toole.
¶55 The Secretary nonetheless asserts that the fact that Berns falsely attested to gathering the signatures on the sheet signed by Nguyen and Toole is insufficient alone to prove that he similarly falsely attested to gathering the signatures on the other sheets submitted under his name. We agree, but additional evidence supported the District Court's finding. It is unrebutted on the hearing record that, at the time Nguyen signed the petition at the request of Hannah Rose Kuntz, Kuntz was in possession of multiple petition signature sheets bearing signatures-not just the sheet signed by Nguyen and Toole. In the manifest absence of any contrary evidence presented by the Secretary or the Green Party, the unrebutted evidence that Berns falsely attested that he gathered the signatures included on the signature sheet signed by Nguyen and Toole and the similarly unrebutted evidence that Kuntz was then in possession of multiple petition signature sheets bearing signatures were together minimally sufficient to support a reasonable inference by the finder of fact that Berns similarly did not personally gather any of the signatures submitted under his circulation affidavits. The fact that such inference was not necessary or the only inference that the record would have supported does not render the inference unsupported by substantial evidence. The Secretary has further not shown that the District Court misapprehended the effect of the evidence of record. Nor are we left, upon our review of the record, with a firm conviction that the District Court was otherwise mistaken. On the limited evidentiary record in this case, we hold that the District Court's finding that Berns falsely attested to personally gathering the subject signatures was not clearly erroneous.
¶56 The District Court invalidated an additional 31 signatures from eight legislative districts on the ground that they were not substantially similar to the signatures on the purported signatories' voter registration forms as required by the secretary of state's signature sheet form and §§ 13-10-601(2)(a), (c), and ***206 13-27-303(1), MCA. As described by the District Court, the supporting evidence included unrebutted evidence that the signatures certified as valid by the Secretary included 31 signature entries that had a similarly printed name in both the "printed name" and "signature" columns on the signature sheets. It is further unrebutted on the hearing record that, in each case, the printed *266 name in the petition sheet "signature" field was substantially different from the "cursive" or "distinctive, stylized script" signature used on the purported signatory's official voter registration form. As asserted by the Secretary, Montana law does not presently prohibit a registered voter from using a printed name, rather than a cursive or distinctive stylized script, for his or her personal signature for voter registration or other legal purposes. The Secretary further correctly points out that, contrary to the reference in the District Court's order, § 13-10-502(1), MCA (required signature sheet format for petitions to nominate independent candidates) has no application to political party ballot eligibility petitions under § 13-10-601(2), MCA. However, the Secretary's peculiar assertion that the District Court erroneously "elevated" the Secretary's own "petition form ... above statutory requirements" disregards that § 13-10-601(2)(a), MCA, expressly requires that political party ballot eligibility petitions be submitted on the form prescribed by the secretary of state. Even more significantly, the Secretary's assertion further disregards the underlying requirements of §§ 13-27-103 and -303(1), MCA, as respectively directly and indirectly incorporated into § 13-10-601(2)(c), MCA, clearly requiring petition signatories to sign "in substantially the same manner as on th[eir] voter registration form." We hold that §§ 13-10-601(2)(a), (c), and 13-27-303(1), MCA, require petition signatories to sign "in substantially the same manner as on th[eir] voter registration form" and that the District Court's finding that 31 signatures from eight legislative districts did not comply with that requirement was not clearly erroneous.
¶57 The District Court invalidated an additional six signatures from three legislative districts on the ground that the petition sheet signature entries did not match the names of registered voters in those districts as required by §§ 13-10-601(2)(b), (c), and 13-27-303(1), MCA. The Secretary does not dispute on appeal that §§ 13-10-601(2)(b), (c), and 13-27-303(1), MCA, require that the name of the purported signatory on each signature sheet match the name of a registered voter on the official registered voters list for the corresponding county. The question of whether the name of a purported petition signatory matches the name of a registered voter on the official registered voter ***207 list for the corresponding county is a question of fact. Finding of fact number 25 sets forth six names as they appeared on petition signature sheets and states on what basis they did not match names on the registered voter list for the county corresponding to the referenced legislative districts. The District Court's finding is supported by the subject petition sheets and registered voter lists for the counties corresponding to the referenced legislative districts. We hold that the District Court did not erroneously invalidate six signature entries on the ground that the listed names did not match the names of registered voters in the subject districts as required by §§ 13-10-601(2)(b), (c), and 13-27-303(1), MCA.
¶58 The District Court invalidated an additional nine signatures from four legislative districts on the ground that they did not bear correct or correctly altered signing dates as required by § 13-10-601(2)(a), MCA. Without mention of the requirements of §§ 13-10-601(2)(a), (c), and 13-27-302, MCA, the Secretary again asserts that the District Court "elevate[d] form over substance" where "the Political Party Qualification statute contains no such requirement." However, § 13-10-601(2)(a), MCA, expressly requires submission of political party qualification petitions on the petition form prescribed by the secretary of state. The prescribed form expressly requires specification of the signature date for each signature. The signature date requirement on the form corresponds to and implements the express requirement of § 13-27-302, MCA, as incorporated by express reference into § 13-10-601(2)(c), MCA, for sworn attestation that the signature gatherer personally "gathered the signatures on" each submitted signature sheet "on the stated dates." The District Court found that nine petition entries certified as valid by the Secretary either included no signature date, "a date that postdate[d] the notarization date of the signature gather affidavit, or a date altered without the signer's initials." Whether the subject petition sheets contained the signature date for each *267 signature as required by the prescribed petition form and circulation affidavit pursuant to § 13-10-601(2)(a) and (c), MCA, was a question of fact. It is unrebutted on the evidentiary record that the nine referenced petition entries either included no signature date, "a date that postdate[d] the notarization date of the signature gatherer affidavit, or a date altered without the signer's initials." We hold that the District Court correctly concluded that § 13-10-601(2), MCA, requires a correct signature date for each petition signature and that the District Court's finding of fact that nine of the subject petition signatures lacked correct signature dates was not clearly erroneous. ***208 ¶59 The District Court finally invalidated an additional five signatures from four legislative districts on the ground that they did not include a printed name as required by § 13-10-601(2)(a), MCA. Section 13-10-601(2)(a), MCA, expressly requires submission of political party qualification petitions on a petition form prescribed by the secretary of state. The prescribed form expressly requires a printed name for each signature. The printed name requirement corresponds with and crucially aids in the county voter list verification required by § 13-27-303(1), MCA, as incorporated by reference in § 13-10-601(2)(c), MCA. The District Court found that five petition entries certified as valid by the Secretary included no printed name. The Secretary did not challenge that finding on appeal. We hold that the District Court correctly concluded § 13-10-601(2), MCA, requires a printed name on each petition sheet corresponding to each signature and that the District Court's finding of fact that five of the subject petition signatures lacked a corresponding printed name was not clearly erroneous. In sum, we hold that the District Court did not erroneously invalidate 87 signatures gathered from eight separate legislative districts as invalid due to noncompliance with § 13-10-601(2), MCA.
¶60 5. Whether the District Court abused its discretion in admitting Kevin J. Hamilton to represent Plaintiffs pro hac vice?
¶61 The Secretary asserts that Plaintiffs failed to show good cause for admission of an out-of-state lawyer to serve as their co-counsel in this matter. A non-resident lawyer not licensed to practice law in Montana but licensed and in good standing to practice in the highest court of another state may appear and practice law in a Montana court or administrative proceeding pro hac vice upon: (1) written application and fee to the State Bar of Montana; (2) certification of qualification by the State Bar; and (3) leave of the presiding court or agency. Rule VI, Rules for Admission to the Bar of Montana. However, absent a showing of good cause, an attorney or firm may not appear pro hac vice in more than two Montana actions or proceedings. Rule VI(C), Rules for Admission to the Bar of Montana. As a non-exclusive example, "good cause" includes, inter alia , "a showing that the attorney or firm seeking to appear pro hac vice possesses experience or expertise not commonly available" in the membership of the State Bar of Montana or "where the attorney or firm is acting as counsel in a multistate class action." Rule VI(C), Rules for Admission to the Bar of Montana. Montana courts have broad discretion to grant or deny pro hac vice motions, see Konitz v. Claver , 1998 MT 27, ¶ 32, 287 Mont. 301, 954 P.2d 1138 (district court ***209 discretion over trial administration matters), but should not grant them "routinely." Rule VI(C), Rules for Admission to the Bar of Montana.
¶62 Here, having appeared in Montana proceedings pro hac vice on seven prior occasions, out-of-state counsel Kevin J. Hamilton was subject to the good cause requirement of Rule VI(C), Rules for Admission to the Bar of Montana. Moreover, the Secretary validly objected that Plaintiffs already had highly competent and experienced Montana counsel[24] and that out-of-state counsel was not *268 essential because this litigation exclusively involved relatively non-complex issues of Montana election law. On appeal, the Secretary further validly asserts and objects that Plaintiffs failed to show, and the District Court failed to find, any rationale indicating on what basis good cause existed to allow Hamilton to make his eighth appearance in Montana proceedings under these circumstances.
¶63 Admission pro hac vice does not necessarily require a showing in every case that the subject matter at issue either involves expertise of a type otherwise unavailable or not commonly available among the membership of the State Bar of Montana, or even beyond that of a party's existing Montana counsel. See Rule VI(C), Rules for Admission to the Bar of Montana. However, Rule VI(C) nonetheless expressly requires some affirmative showing-and implicitly a court or agency finding-of good cause for the requested pro hac vice admission. Here, the District Court summarily granted Plaintiffs' contested pro hac vice ***210 motion without any finding, rationale, or elaboration whatsoever. Moreover, based on our review of the record and the subject matter at issue, we can conceive of no manifest rationale upon which the District Court likely overruled the Secretary's objection and granted the motion. In this void, it appears that the District Court routinely granted the motion contrary to Rule VI(C). Under the circumstances of this case, we hold that the District Court abused its discretion in summarily granting Plaintiffs' motion to admit Kevin J. Hamilton pro hac vice .
¶64 The Secretary has nonetheless failed to show how the erroneous admission of Hamilton prejudiced the merits or presentation of the Secretary's case or opposition to the Plaintiffs' case. Nor is any such prejudice manifest on our review of the record. At the end of the day, the applicable law was the law, the evidentiary facts presented were the evidentiary facts presented, and all parties were represented by able counsel. We have no basis upon which to conclude that the error prejudiced the Secretary or resulted in any fundamental unfairness in the proceeding. Under the circumstances in this case, we hold that the erroneous admission of Hamilton pro hac vice was not reversible error.
CONCLUSION
¶65 We hold that Plaintiffs' claim for declaratory and injunctive relief challenging the legal sufficiency of the Green Party petition, and the Secretary's resulting certification thereof, stated a cognizable claim for relief. We hold that Plaintiffs' claim did not involve a non-justiciable political question. We hold further that the Montana Democratic Party had legal standing to challenge the validity of the Green Party ballot eligibility petition and the Secretary's resulting certification thereof. We hold that the District Court did not erroneously invalidate 87 signatures gathered from eight separate legislative districts as invalid due to noncompliance with § 13-10-601(2), MCA. Finally, we hold that the District Court abused its discretion in summarily granting Plaintiffs' motion to admit Kevin J. Hamilton pro hac vice but that the error was not reversible error on the record in this case.
¶66 Affirmed.
We concur:
MIKE McGRATH, C.J.
BETH BAKER, J.
INGRID GUSTAFSON, J.
JAMES JEREMIAH SHEA, J.
JIM RICE, J.

The county election administrators must forward the specified documentation to the secretary of state "at least 85 days before the date of the primary." Section 13-10-601(2)(d), MCA.

Who or what entity commissioned Advanced Micro Targeting to perform this work is not a matter of record in this case. Danielle Breck of the Montana Green Party testified that the Green Party did not commission or coordinate with the eleventh hour paid signature gathering effort and was unaware of it until learning of it through news media reports.

The complaint named the Green Party as "an interested party."

A "political party committee" is a "political committee formed by a political party" qualified to nominate candidates for public office on the primary election ballot. Section 13-1-101(32), (33), MCA.

After the evidentiary hearing, Plaintiffs filed a motion in this Court pursuant to M. R. App. P. 6 for dismissal of MRLCC's appeal of the denial of its intervention motion as procedurally premature. Receiving no response from MRLCC, we granted the unopposed motion and dismissed MRLCC's appeal as premature on June 19, 2018.

Beyond "irreducible" constitutional limitations, justiciability also includes various prudential policy limitations including, inter alia , that a party may generally assert only the party's own "rights or immunities" and that courts generally should not adjudicate matters "more appropriately" in the domain of the legislative or executive branches or the reserved political power of the people. Heffernan , ¶¶ 32-33. In contrast to constitutional limits which are not subject to judicial discretion or legislative prerogative, the related "prudential limits" of "judicial self-governance" are subject to exceptions or expansion as matters of judicial and legislative discretion. Heffernan , ¶¶ 32-34. Despite this seemingly bright-line distinction, justiciability remains a blend of "uncertain meaning and scope" of immutable constitutional principles and prudential policy considerations. Flast v. Cohen , 392 U.S. 83, 95-101, 88 S.Ct. 1942, 1949-53, 20 L.Ed.2d 947 (1968).

Section 13-10-601(2), MCA, does not expressly incorporate the definition of "signature gatherer," as defined by § 13-27-111(4), MCA, but nonetheless indirectly incorporates it by express incorporation of §§ 13-27-302, -303(3), and -304, MCA, which refer to the term "signature gatherer." See also § 1-2-107, MCA (terms defined in any part of MCA apply to same in other parts absent contrary intention plainly appearing).

A petition signature is substantially similar if, "taken as a whole," it "bears sufficient similarity to the signature on the [voter's] registration form as to provide reasonable certainty of its authenticity." Section 13-27-103, MCA.

At his or her discretion incident to processing a political party nomination qualification petition under §§ 13-10-601(2)(c) and 13-27-303(1), MCA, a county election administrator, "[u]pon discovery of fraudulent ... or duplicate signatures," may request that the county attorney investigate whether a petition signer or signature gatherer committed a criminal offense, such as unsworn falsification, false swearing, or tampering with public records or information as respectively defined by §§ 45-7-202, -203, and -206, MCA. See §§ 13-10-601(2)(c), 13-27-303(3), 13-27-106, 13-35-207, MCA.

If a registered voter in a county has reason to believe that any of the remaining uncompared signatures on a petition sheet or section are "not genuine," the voter may compel the county election administrator to similarly compare those signatures with the corresponding voter registration forms by filing an affidavit attesting to the basis of that belief and requesting verification. Section 13-27-306, MCA. If the county administrator finds any of the challenged signatures are "not genuine," he or she must then similarly compare and verify the balance of previously unverified signatures on that sheet or section and issue an amended certification to the secretary of state. Section 13-27-306, MCA. By manifest implication a per-county voter signature challenge is effective only if made in sufficient time for the county election administrator to comply with § 13-10-601(2)(d), MCA (requiring county to forward certification "to the secretary of state at least 85 days before the date of the primary"). See §§ 13-10-601(2)(c), (d), 13-27-104, 13-27-306, MCA.

The secretary of state "may reject any petition that does not meet statutory requirements" and "shall return a[ny] rejected petition to the proper county official." Section 13-27-307(1), MCA, as indirectly incorporated into § 13-10-601(2)(c), MCA, by express incorporation of §§ 13-27-303 to -306, MCA, to which § 13-27-307, MCA, applies.

Section § 13-10-601(2), MCA, indirectly incorporates § 13-27-307, MCA, through express incorporation of §§ 13-27-304 through -306, MCA, to which § 13-27-307, MCA, applies.

Though we have anomalously referred to the Klaudt claim as a common law claim, see O'Fallon v. Farmers Ins. Exch. , 260 Mont. 233, 243-44, 859 P.2d 1008, 1014-15 (1993) (characterizing Klaudt claim as "common law cause of action" predicated on violations of § 33-18-201, MCA ); the claim is properly characterized as a private right of action implicitly conferred by § 33-18-201, MCA. See Klaudt , 202 Mont. at 250-52, 658 P.2d at 1066-67 (stating issue as whether § 33-18-201, MCA, "confers a private cause of action" and holding that it "does create" duties to private parties, a breach of which is "the basis for a civil action"). Accord Mark Ibsen, Inc. v. Caring for Montanans, Inc. , 2016 MT 111, ¶¶ 41-42, 383 Mont. 346, 371 P.3d 446 (distinguishing statutorily implied tort claims based on violations of statutory duty from common law claims based on violations of independent common law duties).

This formulation consolidates two related and intertwined considerations previously stated separately-whether the asserted private remedy is "consistent with the statute as a whole" and "the intent of the legislature considering the plain language of the statute." Wombold , ¶ 35. See Faust , ¶ 24 ; Klaudt , 202 Mont. at 250-52, 658 P.2d at 1066-67.

See also Touche Ross , 442 U.S. at 575-76, 99 S.Ct. at 2488-89 (modifying implied private remedy analysis of Cort v. Ash , 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) to consider whether: (1) the plaintiff is a member of the particular class for whom the statute was intended to protect or benefit; (2) any express or implicit indication of legislative intent either contemplates or precludes the asserted remedy; and (3) the asserted private remedy is consistent with the provisions and purposes of the overall legislative scheme).

Inter alia , § 27-8-202, MCA, encompasses traditional justiciability requirements including standing, ripeness, mootness, political questions, etc. Accord Cox v. City of Cheyenne 79 P.3d 500, 505 (Wyo. 2003) (construing Wyoming variant of Uniform Declaratory Judgments Act). See also , e.g. , Mitchell v. Glacier Cty. , 2017 MT 258, ¶ 42, 389 Mont. 122, 406 P.3d 427 ; Miller v. State Farm Mut. Auto. Ins. Co. , 2007 MT 85, ¶¶ 7-19, 337 Mont. 67, 155 P.3d 1278 ; Northfield Ins. Co. v. Mont. Ass'n of Ctys. , 2000 MT 256, ¶¶ 14-28, 301 Mont. 472, 10 P.3d 813.

See also Montanans for Justice , ¶¶ 42-87 (claim for declaratory judgment and injunctive relief challenging compliance of ballot initiative petitions with statutory prerequisites); Marbut v. Sec'y of State , 231 Mont. 131, 135-36, 752 P.2d 148, 151 (1988) (distinguishing cognizable taxpayer interest/right to seek declaratory judgment in re government officer statutory compliance from associated requirement for asserted personal harm); Mont. Wilderness Ass'n v. Bd. of Health & Envtl. Scis. , 171 Mont. 477, 497, 559 P.2d 1157, 1167 (1976) (holding that citizen conservation groups had standing to assert claim for declaratory and injunctive relief in re state regulatory agency compliance with statutory environmental standards for subdivision plat approval); State ex rel. Conrad v. Managhan , 157 Mont. 335, 338-42, 485 P.2d 948, 950-51 (1971) (holding that affected taxpayers had standing to assert claim for declaratory judgment and injunction compelling counties to value and assess timberlands per state board of equalization valuations and assessments).

As a prerequisite to the exercise of subject matter jurisdiction, standing is not subject to waiver and is subject to contest at any time by a party or sua sponte . Baxter Homeowners Ass'n, Inc. v. Angel , 2013 MT 83, ¶ 14, 369 Mont. 398, 298 P.3d 1145 ; Miller , ¶¶ 7-8.

The MUDJA expressly recognizes the independent justiciability requirement for standing. See § 27-8-202, MCA ("[a]ny person interested ... whose rights, status, or other legal relations are affected" may obtain a declaratory judgment regarding the affected "rights, status, or other legal relations").

In contrast, a claim in which standing initially existed may nonetheless become non-justiciable or moot prior to judgment if the plaintiff subsequently ceases to have a personal stake in the outcome of the controversy "throughout the litigation." Heffernan , ¶ 30.

With the parties' focus on the standing of the Montana Democratic Party, the personal standing of the other plaintiffs is unclear on the evidentiary record and briefing before us. But see , supra , Sawyer Stores , 103 Mont. at 176-77, 62 P.2d at 355-56 ; Clarke , 24 Mont. at 442-45, 63 P. at 393-95. Based on the demonstrated standing of the Democratic Party and the fact that they seek no relief apart from the relief requested by the Party, we need not separately address the standing of the other plaintiffs.

See Lewis and Clark County Submittal 09 (7 sheets), Lewis and Clark County Submittal 11 (1 sheet), Yellowstone County Submittal 12 (3 sheets), and Yellowstone County Submittal 22 (4 sheets).

Executed in Yellowstone County on March 4, 2018, Berns's circulation affidavits listed a Missoula County street address as his address of residence. The record is silent as to why neither Berns nor Kuntz were called to testify in support of Berns's challenged affidavits.

As noted by the Secretary and not disputed by Plaintiffs, "Appellees' chosen Montana counsel" has previously "represented the Montana Democratic Party in other political cases," is an "experienced Montana trial attorney who has appeared before [the Montana Supreme Court] at least 20 times on a variety of issues," and:
has practiced law in Montana for 37 years. He has represented such distinguished clients as famous author Jon Krakauer. He was admitted before the U.S. Supreme Court in 1985. He is uniquely qualified to address elections issues, having served in the Montana House of Representatives from 1975-1979, including serving in leadership. [He] is a member of the Montana Trial Lawyers Association, the American Board of Trial Advocates, and the International Society of Barristers. He has an AV rating with Martindale Hubbell, is listed in Best Lawyers in America for employment and First Amendment law, and was selected as a Mountain States Super Lawyer[ ] for labor and employment and civil rights law. He has received several awards for his legal work, including the Montana Free Press Award, Society of Professional Journalists and University of Montana School of Journalism (2003); the Montana Trial Lawyers Appellate Advocacy Award (2004); the Montana Trial Lawyers Public Service Award (2007); the Montana Trial Lawyers Citizens Award (2012); and the Montana Trial Lawyers Career Achievement Award (2013).