FILED

09/14/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0706

DA 19-0706

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 228

IN THE MATTER OF:

N.A.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Broadwater, Cause No. ADI-2019-01
Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kristen L. Peterson, Assistant Appellate
          Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Tammy K Plubell, Appellate
          Services Bureau Chief, Bree Gee, Assistant Attorney General, Helena,
          Montana

          Cory J. Swanson, Broadwater County Attorney, Townsend, Montana

Submitted on Briefs:  August 18, 2021

Decided:  September 14, 2021

Filed:

                   _____
                              Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    N.A. appeals the order of the Montana First Judicial District Court, Broadwater County, committing her to Montana State Hospital at Warm Springs for a period of up to ninety days. We reverse.

¶2    N.A. presents the following issue for review:

*Whether the District Court committed reversible error when it allowed testimony by video conferencing at the commitment hearing over N.A.'s objection.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    N.A. suffers from unspecified schizophrenia. On October 1, 2019, N.A. told her psychiatrist that she was experiencing increased depression with suicidal thoughts and auditory hallucinations. On her psychiatrist's recommendation, N.A. went to St. Peter's Hospital in Helena, where she was evaluated by a certified mental health professional after reporting the same concerns. Based on these concerns, N.A. was voluntarily admitted to the Hays Morris House in Butte on October 1. Upon discharge on October 4, N.A. informed staff that she would commit suicide by slitting her wrists if she left Hays Morris. This conversation led to the State's petition for N.A.'s involuntary commitment that same day. The petition alleged that N.A. presented an imminent risk of harm to herself based upon her statements of suicidality.

¶4    The District Court scheduled an evidentiary hearing on the petition for October 11. At the onset of the hearing, the State informed N.A. of its intent to call four witnesses, including Ashley Post (Post), a licensed clinical social worker with the Western Montana Mental Health Center. The State proposed to have Post testify by Vision Net (a two-way

2

electronic audio-video communication system). N.A. objected on Confrontation Clause grounds. The prosecutor representing the State indicated that "this is the first notice I have that there is a concern there. I thought I had informed them that I was potentially going to be calling [Post] by Vision Net . . . We could have had her appear in person." The State further explained that Post's absence stemmed from a concern about being away from her office in case of an emergency. N.A. did not withdraw the objection, but indicated that, if the District Court wished to proceed, N.A. would not seek to continue the hearing. The District Court overruled the objection, relying on its interpretation of Montana's Confrontation Clause jurisprudence and the State's presentation of §§ 53-21-140(1) and 53-21-140(3), MCA. The State did not alert the District Court of any other subsection of § 53-21-140, MCA.

¶5     The State proceeded to call Post to testify by Vision Net. Post testified regarding the circumstances that led to N.A.'s involuntary commitment. Post also testified concerning her evaluation of N.A. the day before the commitment hearing. During Post's evaluation, N.A. presented delusional thoughts that her brothers tried to overdose her and that one of her brothers held her captive for a year. N.A. informed Post that, while she had expressed suicidal thoughts on October 4, she did not feel suicidal on October 10. Post drafted a report based on her evaluation of N.A. In her report, Post noted that N.A. was inconsistently taking her mental health medications, but that it remained unknown whether N.A. was able to provide for her own basic needs. Post's report also reflected her opinion that N.A. was an imminent threat of injury to herself or others and required a placement that allowed involuntary medication for N.A.'s psychiatric stabilization. Based on her

3

evaluation and her review of N.A.'s records, Post testified that she believed N.A. remained suicidal and would potentially deteriorate without further treatment. Post also testified that her opinion as to N.A.'s mental disorder was based upon a reasonable degree of medical certainty.

¶6 Three other witnesses were present and testified after Post. N.A.'s brother and N.A.'s sister-in-law testified to their observations of N.A.'s behaviors over the previous two years and offered their general opinions that N.A. was unable to care for herself. The State also offered testimony from the county's fire chief. The fire chief testified regarding an instance eight months prior in which N.A. called in a false report of a fire, thereby raising his concerns over decreasing the limited pool of first responders for other potential fires.

¶7 Based on the testimony presented, the District Court found that N.A. suffered from a mental disorder and required commitment. The District Court further found that, based upon the testimony of N.A.'s brother and N.A.'s sister-in-law, N.A. was substantially unable to provide for her own basic needs. Relying upon Post's testimony, the District Court found that an imminent threat of injury to N.A. and others existed and that N.A.'s recent behaviors, including her failure to consistently take her medications, created difficulties in protecting her life and/or health. The District Court noted that less restrictive options were unavailable because other inpatient treatment facilities could not provide involuntary medication for N.A. The District Court ordered that N.A. be involuntarily placed at Montana State Hospital in Warm Springs for a period of up to ninety days.

**STANDARD OF REVIEW**

¶8 This Court reviews a district court's civil commitment order to determine whether the court's findings of fact are clearly erroneous and its conclusions of law are correct. *In re B.H.*, 2018 MT 282, ¶ 9, 393 Mont. 352, 430 P.3d 1006. A finding of fact is clearly erroneous only if it is not supported by substantial credible evidence, the district court misapprehended the effect of the evidence, or we have a definite and firm conviction upon review of the record that the court otherwise erred. *In re C.K.*, 2017 MT 69, ¶ 10, 387 Mont. 127, 391 P.3d 735. Strict adherence to the involuntary commitment statutory scheme is required, considering the utmost importance of the rights at stake. *In re S.D.*, 2018 MT 176, ¶ 8, 392 Mont. 116, 422 P.3d 122. We exercise de novo review when deciding questions of law such as whether the district court correctly interpreted and applied relevant statutes. *In re Mental Health of O.R.B.*, 2008 MT 301, ¶ 14, 345 Mont. 516, 191 P.3d 482.

**DISCUSSION**

¶9 *Whether the District Court committed reversible error when it allowed testimony by video conferencing at the commitment hearing over N.A.'s objection.*

¶10 N.A. argues that the District Court committed reversible error when it allowed Post to testify by Vision Net over N.A.'s objections. The State does not contest that the District Court erred but contends that such error was harmless and does not warrant reversal.

¶11 It is well established that when construing a statute, it must be read as a whole and no term should be isolated from the context of the statute. *Eldorado Coop Canal v. Hoge*, 2016 MT 145, ¶ 18, 383 Mont. 523, 373 P.3d 836. The intent of the legislature is to be

determined from the plain language of the statute. *In re J.J.*, 2018 MT 184, ¶ 13, 392 Mont. 192, 422 P.3d 699. If the intent can be determined from the plain language of the statute, a court may not go further and apply any other means of interpretation. *In re J.J.*, ¶ 13.

¶12 Title 53, chapter 21, part 1, MCA, regulates several aspects of the State's treatment of the seriously mentally ill. Among those regulations, § 53-21-140, MCA, regulates the use of two-way electronic audio-video communications during any hearing conducted under chapter 21. Pertinently, § 53-21-140(3), MCA, enumerates the following proceedings which may be conducted by electronic communications at the court's discretion:

> (a) the initial hearing provided for in 53-21-122;
> (b) the detention hearing provided for in 53-21-124;
> (c) the trial or hearing on a petition provided for in 53-21-126;
> (d) a hearing on posttrial disposition as provided for in 53-21-127;
> (e) a hearing on the extension of a commitment period as provided for in 53-21-128;
> (f) a hearing on rehospitalization of a person conditionally released from an inpatient facility as provided for in 53-21-197;
> (g) a hearing on an extension of the conditions of release as provided for in 53-21-198.

Subsection (5) provides that two-way electronic audio-video communications "may not be used" in either "an initial hearing provided for by § 53-21-122, MCA, if the professional person objects" or "in a hearing referred to in subsections (3)(b) through (3)(g) if a respondent or patient, the respondent's or patient's counsel, or the professional person objects." Section 53-21-140(5)(a)-(b), MCA. Courts construing legislative use of the

6

phrase "may not" have consistently held that the phrase is mandatory. *Van Der Hule v. Mukasey*, 2009 MT 20, ¶ 11, 349 Mont. 88, 217 P.3d 1019.

¶13 The District Court erred in allowing Post to testify by Vision Net. While the plain language of § 53-21-140(3), MCA, undoubtedly provides a court discretion in allowing or disallowing the use of electronic communications in certain proceedings, § 53-21-140(5), MCA, just as undoubtedly curtails that discretion.[1] If the respondent, patient, or their counsel objects, the district court's discretion is terminated, and the court may not allow testimony by electronic audio-video communication. N.A. objected to Post's testimony. Upon objection, the District Court had no discretion to allow Post to testify remotely. Allowing Post to testify violated the plain and unambiguous language of the statute.

¶14 The State contends that the District Court's decision to allow Post to testify by Vision Net was reasonable and constituted a harmless error that failed to cause N.A. substantial prejudice. That misconstrues our application of the harmless error doctrine.

---

[1] The Court's duty in applying a statute remains "to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We will not interpret the statute further if the language is clear and unambiguous and will only look to legislative intent if the language is not clear and unambiguous. *Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003. Moreover, our "role is not to determine the prudence of a legislative decision . . . [i]t is for the legislature to pass upon the wisdom of a statute." *Rohlfs v. Klemenhagen, LLC*, 2009 MT 440, ¶ 20, 354 Mont. 133, 227 P.3d 42 (citations omitted). "[I]nartful legislative drafting . . . does not excuse us from the responsibility of construing a statute as faithfully as possible to its actual text." *DePierre v. United States*, 564 U.S. 70, 82, 131 S. Ct. 2225, 2233 (2011). We believe the language remains clear and unambiguous and note the dissent's thorough recap of the legislative history. However, we provide the following omitted sentence for full context: "*It is up to the patient, and if they object or don't want to do it, they don't have to do it.*" S. 107, 57th Leg., Reg. Sess. (Mont. 2001); *House Human Services Committee Hearing Minutes in re SB 107* (Mar. 9, 2001) (Introductory statement of Mont. Sen. Eve Franklin, Sponsor) (emphasis added).

While it remains true that "harmless error does not mandate that we reverse a district court judgment," *In re Mental Health of O.R.B.*, ¶ 30, this Court nonetheless "firmly enforce[s] the statutory requirements for involuntary commitment proceedings." *In re L.L.A.*, 2011 MT 285, ¶ 20, 362 Mont. 464, 267 P.3d 1. In *L.L.A.*, we reversed the District Court's commitment of L.L.A. due to the District Court's failure to provide a sufficiently detailed statement of facts supporting its commitment order as required by § 53-21-127(8)(a), MCA. *In re L.L.A.*, ¶ 23. We noted that "[w]hile we have found errors harmless in involuntary commitment proceedings . . . those errors did not amount to violation of the specific statutory mandates for ordering an involuntary commitment." *In re L.L.A.*, ¶ 20. We have also noted, in an involuntary commitment proceeding alleging ineffective assistance of counsel, that "a commitment can be reversed based on a failure to strictly adhere to the statute."[2] *In re J.S.*, 2017 MT 214, ¶ 18, 388 Mont. 397, 401 P.3d 197.

¶15 Section 53-21-126, MCA, sets forth the requirements for the trial or hearing on the petition for involuntary commitment. Included among those requirements is the mandate that "[t]he professional person appointed by the court must be present for the trial and subject to cross-examination." Section 53-21-126(3), MCA. While a professional person may appear by electronic audio-video communication, § 53-21-140(5)(b), MCA, restricts that general rule in instances where the respondent objects. The procedural safeguards contained in Montana's civil commitment laws "are of critical importance because of the

---

[2] We further noted, and reiterate today, that we "have never held, however, that *de minimis* errors which do not result in prejudice to the respondent will serve as a basis for reversal." *In re J.S.*, ¶ 18, n. 3.

calamitous effect of a commitment, including loss of liberty and damage to a person's reputation." *In re Mental Health of T.J.D.*, 2002 MT 24, ¶ 20, 308 Mont. 222, 41 P.3d 323. In *T.J.D.*, we reversed T.J.D.'s commitment and declined to apply the harmless error doctrine, holding that the district court erroneously relied on inadmissible hearsay statements contained in the professional person's report. *In re Mental Health of T.J.D.*, ¶¶ 18-22. The restriction of T.J.D.'s liberty and the stigma of a civil commitment supported our refusal to apply harmless error. *In re Mental Health of T.J.D.*, ¶ 21.

¶16    Under the circumstances, we conclude that the District Court's error was not harmless and accordingly merits reversal. Post was the professional person and the State's key witness. Her attendance was required both statutorily under § 53-21-126(3), MCA, and by the District Court's order setting the hearing. Post did not appear in person, but by Vision Net over N.A.'s objection. This fell within the exception to the general rule allowing appearances over electronic audio-video communications. The District Court's findings of fact and conclusions of law relied, to a large extent, on the testimony of Post. The District Court's decision to place N.A. at Montana State Hospital over other less restrictive alternatives rested on Post's testimony that less restrictive alternatives did not allow for involuntary medication. In sum, the District Court relied on Post's testimony to reach its conclusions. In doing so, the District Court's errors amounted to a violation of the specific statutory mandates for ordering an involuntary commitment. *See In re L.L.A.*, ¶ 20. We decline to apply the harmless error doctrine.

¶17    Finally, the State contends that N.A. either failed to clearly object or, alternatively, waived the objection and acquiesced to the use of Vision Net by failing to seek a

9

continuance. These arguments fail on several fronts. First, we consider "an objection sufficient if it specifies the reason for disagreement with the procedure employed by the court." *State v. Johns*, 2019 MT 292, ¶ 18, 398 Mont. 152, 454 P.3d 692 (citations omitted). Conversely, "mere objection without assignment of the specific reason for the objection is not a proper objection." *Johns*, ¶ 18 (citations omitted). N.A.'s objection was plainly sufficient to identify the reason for disagreement with the District Court. The State sought to present Post's testimony by Vision Net. N.A. objected to the use of Vision Net. While the stated grounds for the objection rested on the Confrontation Clause, the underlying objection remained the same: N.A. objected to Post's testimony by Vision Net. This sufficiently identified N.A.'s disagreement with the District Court and, despite the State's argument otherwise, constituted a clear objection.

¶18 Second, the State's argument attempts to create the illusion of choice, alleviate the State's burden of proof, and, in the process, circumvent the strict statutory requirements governing the involuntary commitment process. The burden of proving that a commitment is necessary remains with the State, and a respondent has the right to require the State to meet its burden of proof. *In re J.S.*, ¶ 27. The hearing on the petition for the involuntary commitment must be held within five days unless the fifth day falls upon a weekend or holiday and unless additional time is requested on behalf of the respondent. Section 53-21-122(2)(a), MCA. N.A.'s initial appearance was held on Monday, October 7, 2019. The District Court held the hearing on the petition on Friday, October 11, the fifth and final day of the statutorily mandated timeline. The commitment hearing was being conducted by a different judge than the originally assigned judge to ensure that the

10

hearing would not have to be continued over the weekend and beyond the statutory timeline. At N.A.'s hearing, the State informed N.A. for the first time of its intention to have Post testify by Vision Net. After N.A. objected, the prosecutor indicated that he "thought [he] had informed them that [he] was potentially going to be calling the witness by Vision Net[,]" that "this is the first notice [he had] that there is a concern there[,]" and that "[w]e could have had [Post] appear in person." A continuance would have simply extended the time that N.A. was involuntarily detained pending the hearing on the petition. Moreover, while it remains true that the respondent may request additional time and thus extend the statutory five-day requirement, a request for continuance here would not have arisen voluntarily. N.A.'s request for a continuance would have been motivated solely by the State's apparent failure to notify N.A. of its intention to have Post testify by Vision Net, thereby effectually excusing that failure. Similarly, a continuance would have allowed the State, after hearing N.A.'s objection, additional time to call Post to testify in person, thereby strengthening the State's case for N.A.'s involuntary commitment. Simply put, N.A. owed the State no obligation to seek a continuance.

¶19 Finally, and perhaps most clearly, the State's argument contradicts the plain and unambiguous language of the statute. Section 53-21-140(5)(b), MCA, expressly prohibits the use of electronic communications when the respondent or their counsel objects. A waiver of this express prohibition would arise by failing to object. That is not the case here. N.A. objected. The State informed the District Court of §§ 53-21-140(1) and 53-21-140(3), MCA, but no other statutory subsection. N.A. deferred to the District Court, but never withdrew the objection. At that point, the District Court was statutorily mandated

11

to prohibit Post's testimony by Vision Net. Instead, relying on the subsections presented by the State, the District Court erroneously overruled N.A.'s objection. N.A. cannot reasonably be construed as voluntarily acquiescing to Post's testimony by Vision Net, nor does the statutory language support a finding of waiver.

**CONCLUSION**

¶20 The District Court committed reversible error when it allowed Post to testify by Vision Net over N.A.'s objection. The judgment is reversed.


/S/ LAURIE McKINNON


We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON


Justice Dirk Sandefur, dissenting.

¶21 The Court employs an overly simplistic and undiscerning plain language construction to construe § 53-21-140(5), MCA, to prohibit the State from presenting the testimony of the examining professional person[1] at trial under § 53-21-126, MCA, by means of two-way electronic audio-video conferencing if the respondent or his or her counsel objects. However, neither its plain language, properly construed in context, nor its legislative history support the Court's expansive construction of § 53-21-140, MCA.

---

[1] *See* §§ 53-21-121(2)(c), -122(2)(a), -123, and -126(3), MCA.

12

¶22 In construing the meaning or effect of statutes, we must simply "ascertain and declare what is in terms or in substance contained therein," not "insert what has been omitted" or "omit what has been inserted." Section 1-2-101, MCA. In doing so, we must, to the extent possible, effect the manifest intent of the Legislature in accordance with the clear and unambiguous language of its enactments in context, without resort to other means of construction. *Larson v. State*, 2019 MT 28, ¶ 28, 394 Mont. 167, 434 P.3d 241 (citing *Mont. Vending, Inc. v. Coca-Cola Bottling Co.*, 2003 MT 282, ¶ 21, 318 Mont. 1, 78 P.3d 499). We must thus first attempt to construe the subject language not merely in accordance with its plain meaning in isolation, but in context of the statute as a whole, and in furtherance of the manifest purpose of the statutory provision and the larger statutory scheme in which it is included. *Mountain Water Co. v. Mont. Dep't of Revenue*, 2020 MT 194, ¶ 27, 400 Mont. 484, 469 P.3d 136 (citing § 1-2-106, MCA, and *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 18, 354 Mont. 15, 221 P.3d 666); *City of Bozeman v. Lehrer*, 2020 MT 55, ¶ 11, 399 Mont. 166, 459 P.3d 850 (citing *State v. Heath*, 2004 MT 126, ¶ 24, 321 Mont. 280, 90 P.3d 426 and *S.L.H. v. State Comp. Mut. Ins. Fund*, 2000 MT 362, ¶ 16, 303 Mont. 364, 15 P.3d 948); *In re Marriage of McMichael*, 2006 MT 237, ¶ 14, 333 Mont. 517, 143 P.3d 439. In construing several statutory "provisions or particulars," we must, to the extent possible, construe them in harmony to give effect to all. Section 1-2-101, MCA. If the subject language remains vague or ambiguous in meaning or application, we may then resort to pertinent extrinsic means of construction including, *inter*

13

*alia*, the underlying legislative history of the statute. *Clark v. Massey*, 271 Mont. 412, 417, 897 P.2d 1085, 1088 (1995).

¶23 Starting with its express language, § 53-21-140, MCA, affirmatively grants courts discretion to conduct specified proceedings under Title 53, chapter 21, part 1, MCA, by two-way electronic audio-video communication (*i.e.*, videoconferencing), "[w]henever the law requires that a *respondent or patient . . . be present* before [the] court." Section 53-21-140(2)-(3), MCA (emphasis added). *Compare* §§ 53-21-115(2) and -122(2)(a), MCA (respondent right "to be present" "in any hearing" and requirement that "respondent must be brought before the court" for the initial hearing). In such event, a proceeding conducted via two-way videoconferencing that "allow[s] all of the participants to be [seen] and heard by all present[] is," as a matter of law, "a hearing in open court." Section 53-21-140(1), MCA. Conduct of a required hearing by videoconferencing in accordance with § 53-21-140, MCA, "does not abrogate" the respondent's procedural and substantive rights under §§ 53-21-115 through -117, MCA. Section 53-21-140(4), MCA. However, as pertinent here, two-way videoconferencing "may not be used" as authorized in § 53-21-140(2)-(3), MCA, "if [the] respondent or patient, . . . [his or her] counsel, or the [court-appointed] professional person objects." Section 53-21-140(5)(b), MCA.

¶24 Pursuant to the express language of subsections (2) and (4), the sole purpose and effect of § 53-21-140, MCA, is to provide for the "*respondent or patient*" to appear and participate remotely via two-way videoconferencing as an alternative to having to be

14

physically present in court.[1]  *See* § 53-21-140(2)-(4), MCA (emphasis added).  *Compare*

§ 53-21-115(2), MCA (respondent right "to be present" "in any hearing").  Consequently,

based on the limited purpose and effect of the express statutory authorization to which it

pertains, § 53-21-140(5)(b), MCA, has no purpose or effect other than to allow the

respondent, his or her counsel, or the examining court-appointed professional person to

object, thereby requiring the respondent's physical presence in court in accordance with

§ 53-21-115(2), MCA (respondent right "to be present" at "any hearing").  *See*

§ 53-21-140(2) and (4)-(5), MCA.[2]  However, nothing in the express language of

§ 53-21-140, MCA, more broadly regulates, or even references, whether and when *other*

*witnesses*, including the court-appointed professional person, must be physically present in

court or may alternatively appear and participate via two-way audio-video conferencing.

Based on its clear and unambiguous language, § 53-21-140, MCA, simply does not apply

to the manner or means by which *the professional person* may appear and "be present" at

trial subject to cross-examination in accordance with § 53-21-126(3), MCA.  It expressly

applies only to the manner and means of the respondent's presence.  *See* § 53-21-140(2),

MCA.  The Court's expansive reading of § 53-21-140(5)(b), MCA, to prohibit the

---

[1] If the respondent is in state custody or control, whether in jail or under court order as is often the case, the physical presence requirement necessarily requires the State, through the local sheriff, to physically transport the respondent, usually in handcuffs or shackles, to and from court.

[2] The Court's expansive construction of § 53-21-140(5)(b), MCA, would absurdly construe it to, *inter alia*, expressly authorize the professional person to object to the professional person's own desire or consent to be present via two-way videoconferencing.  *See* § 53-21-140(5)(b), MCA (listing authorized objecting parties as the respondent, respondent's counsel, "or the professional person").

15

examining professional person from participating at trial via two-way videoconferencing is thus wholly unsupported by the express language of § 53-21-140, MCA, properly construed in context.[1]

¶25    Though not necessary for a proper plain language construction of § 53-21-140, MCA, the legislative histories of §§ 53-21-126(3) and -140, MCA, similarly evince no legislative intent to prohibit the court-appointed professional person from appearing and being subject to cross-examination via two-way videoconferencing.   In 1975, the Legislature first enacted what is now codified as Title 53, chapter 21, part 1, MCA, as amended.  1975 Mont. Laws ch. 466 ("An Act to Provide for Determination and Treatment of the Seriously Mentally Ill and Those Suffering from Mental Disorders" (case altered), originally § 38-1301, et seq., RCM (1947) (1975)).   In pertinent part, the Act originally required the court-appointed professional person "be present in court" and "subject to cross-examination."   Section 38-1306(4), RCM (1947) (1975 Mont. Laws ch. 466, § 6 – now § 53-21-126(3), MCA, as amended).  In 1977, the Legislature rewrote the Act, in pertinent part, to require that the professional person "be *present for the trial* and subject to cross-examination."   1977 Mont. Laws ch. 546, § 5 (amending § 38-1306(4) and renumbering as § 38-1305(7), RCM (1947) – now § 53-21-126(3), MCA – emphasis added).  While this express language manifests the Legislature's intent that the professional

---

[1] The question of whether § 53-21-126(3), MCA, *alone* prohibits the professional person from appearing and being "present" for cross-examination via two-way videoconferencing is not at issue in this case.  Notably, its requirement for the professional person to be "present for the trial" has never been one of the many procedural and substantive rights carefully guaranteed to respondents under §§ 53-21-115 through -117, MCA.

person be "present for trial," § 53-21-126(3), MCA, was enacted and revised into its current form long before the advent of the modern two-way audio-video conferencing subsequently recognized by the Legislature 24 years later as the substantial equivalent of the professional person's physical presence in court. *Compare* § 53-21-140(1), MCA. Whatever alternative means of testimony § 53-21-126(3), MCA, was intended to preclude in favor of the professional person's *presence* in court (such as, *e.g.*, deposition, affidavit, or telephonic testimony), the Legislature clearly did not intend § 53-21-126(3) to preclude the professional person from appearing via modern two-way videoconferencing, a technology that did not even exist in current form at the time, and which would not until many years later.

¶26 In contrast, the Legislature enacted § 53-21-140, MCA, in 2001, well-after the advent and acceptance of modern two-way audio-video conferencing, as specified therein, as an adequate and reliable means of remote participation in court proceedings without prejudice to a respondent's statutory right to cross-examination of adverse witnesses. *See* 2001 Mont. Laws ch. 212, § 1. Consistent with the express language of § 53-21-140(2) and (4), MCA, it did so solely for the purposes of lessening the impact of unnecessary custodial travel on already-distressed mental health respondents/patients and concomitantly reducing unnecessary transportation costs incurred by counties, to wit:

> [This bill] would allow teleconferencing [in] mental health proceedings . . . with those individuals who are in crisis and are brought to jail . . . . Next, they are hauled to Warm Springs, then they are taken back to the community of origin to undergo court proceedings. This causes distress on the individuals and also costs the counties a considerable amount of money.

17

S. 107, 57th Leg., Reg. Sess. (2001); *Senate Public Health, Welfare and Safety Committee*

*Hearing Minutes in re SB 107* (Jan. 17, 2001) (Introductory statement of Sen. Eve Franklin,

Sponsor). As further explained before the House Human Services Committee:

> The issue is, when individuals are in a compromised state, they are not well, they are experiencing psychiatric symptoms and in some instances have to be transported and have to travel long distances back and forth from the [s]tate [h]ospital to their count[ies] of origin in order to go through the mental health proceedings. This bill allows for the use of two-way electronic audio-video equipment . . . rather than in all cases the individuals having to travel. The purpose of it . . . is really from a humane aspect. There are times when people, who may be civilly committed, in jail, in a hospital, [or] in a community setting, are transported to Warm Springs and then have to come back, a six or three hour trip, depending on where [they] are in the state. It is not unheard of for people to be travelling round trip, in the company of a sheriff, in a police car or sheriff's vehicle, sometimes in handcuffs, and it's inappropriate and not humane and doesn't really serve the patient very well . . . [I] ha[ve] experienced this situation personally as a clinical specialist in psychiatric nursing, and . . . used to work part-time in a jail setting, where there were people who had to be transferred back and forth. Other county hearings were done over telecommunications from the jail . . . , and [I] [think] they ought to be able to do that [in mental health proceedings as well]. Often there is hesitancy, because of not being sure what the implications are, when it isn't explicitly [authorized] in statute. Maybe the letter of the law doesn't prohibit it, but if there is no precedent for it, particularly in . . . mental health hearings, there is understandable discomfort.
>
> .    .    .
>
> The other piece of the bill is the financial piece, which was brought to the Legislative Finance Committee by a sheriff. Transporting someone ties up sheriff's vehicles, time, overtime[,] and the cost of transportation. . . . Certainly[,] it will be a savings to the count[ies], . . . in terms of their transportation costs.

S. 107, 57th Leg., Reg. Sess. (2001); *House Human Services Committee Hearing Minutes*

*in re SB 107* (Mar. 9, 2001) (Introductory statement of Sen. Eve Franklin, Sponsor).[1] Thus,

---

[1] Eight years later, incident to introduction of the later-enacted 2009 Mont. Laws ch. 42, § 1 (which revised § 53-21-140(5)(a) to reduce the number of qualified objectors at the initial hearing), the bill sponsor indicated the Legislature's continued understanding of the intended narrow purpose

18

as clearly manifest in both its express language and underlying legislative history, § 53-21-140, MCA, simply has no bearing on the broader question of whether the court-appointed professional person may lawfully appear and "be present" subject to cross-examination by modern two-way videoconferencing in accordance with § 53-21-126(3), MCA.

¶27 In the absence here of any supported showing of constitutional deprivation, I would affirm the District Court on a right result/wrong reason basis. I dissent.

/S/ DIRK M. SANDEFUR

Chief Justice Mike McGrath and Justice Jim Rice join in the dissenting Opinion of Justice Sandefur.

/S/ MIKE McGRATH
/S/ JIM RICE

---

of § 53-21-140, MCA—to reduce the amount of shuffling of mental health patients between courts around the state and the state hospital. S. 157, 61st Leg., Reg. Sess. (2009); *Senate Judiciary Committee Hearing Minutes in re SB 157* (Jan. 13, 2009) (Sen. Jim Shockley, Sponsor).